# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-CT-00250-SCT

*BLUEWATER LOGISTICS, LLC, BLUEWATER*
*BAY LLC, PATRICIA L. MOSSER, MARQUETTA*
*SMITH AND MICHAEL J. FLOYD*

*v.*

*JAMES STEWART WILLIFORD, JR.*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 01/07/2008 |
| TRIAL JUDGE: | HON. JOHNNY LEE WILLIAMS |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | ROBERT R. MARSHALL |
| ATTORNEY FOR APPELLEE: | L. CLARK HICKS, JR. |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE JUDGMENT OF THE CHANCERY COURT OF FORREST COUNTY IS REINSTATED AND AFFIRMED. THIS CASE IS REMANDED TO THE CHANCERY COURT FOR PROCEEDINGS CONSISTENT WITH THIS OPINION - 01/27/2011 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1. The four individual parties to this litigation formed two member-managed limited liability companies (LLCs) to operate a business known as Bluewater. The three defendants locked out the plaintiff (literally and figuratively) and notified him they were exercising a provision in both LLCs' operating agreements that allowed them to buy his twenty-five

percent interest in Bluewater. After he sued them in chancery court, they changed their minds about buying him out, but insisted that "his firing as an employee [was] affirmed and confirmed." The chancellor – finding the plaintiff was entitled to the fair-market value of his interest in Bluewater – entered judgment against the LLCs and the individual defendants. The defendants claim that, because they withdrew their offer to purchase the plaintiff's interest, the chancellor had no authority to force them to buy him out, and that there was no basis for individual liability.

¶2. Under Mississippi law, every member of a member-managed LLC is entitled to participate in managing the business. But even after the defendants claim they had changed their minds about buying the plaintiff's interest in Bluewater, they continued to insist that he was "fired" and could have no part in managing the business. The chancellor held this conduct was a willful, grossly negligent breach of contract. And because the operating agreements provided for individual liability in cases of willful, grossly negligent conduct, the chancellor entered judgment against the individual defendants. We cannot say the chancellor abused his discretion, so we affirm – in part. But because the chancellor incorrectly stated he had no authority to award attorney fees to the plaintiff; and because – without determining a reasonable rate of interest – he awarded post-judgment interest at the "statutory rate," we remand for a hearing on those issues.

## BACKGROUND FACTS AND PROCEEDINGS

¶3. James Williford Jr., Patricia Mosser, Marquetta Smith, and Michael Floyd formed two Mississippi limited liability companies – Bluewater Bay, LLC, and Bluewater Logistics,

2

LLC, – to bid on lucrative government contracts related to the aftermath of Hurricane Katrina.

¶4.     After Bluewater had completed more than $5 million in contracts, and with more than $1 million in payments due from the government, Smith called Williford (who was working in Louisiana) to inform him that she, Mosser, and Floyd – as a "super majority" of seventy-five percent of the Bluewater ownership – had exercised their right under the operating agreements to buy him out.  Williford returned to the Bluewater offices the next day and found the locks on the company offices had been changed.  He then received from the Bluewater LLCs a formal notice that, as of January 31, 2006, his status as a "partner" of Bluewater had been "terminated"; that he was to "cease and desist from performing any business" on behalf of the company; and that he would be paid "one-quarter of the fair market value" of the companies.

¶5.     Williford sued both LLCs and the three individual, super-majority members ("Defendants").  In addition to damages, he asked for injunctive relief to protect his interest in the LLCs, and to prevent the three super-majority members from improperly ousting him.

        *February 15, 2006, Hearing*

¶6.     On February 15, 2006, the chancellor held a hearing on the injunction issues.  Counsel for Defendants told the chancellor that Bluewater's certified public accountant (CPA), John Havard

> is now working on the amount and we anticipate a closing will be set on that in the next week or two. . . .  The company and the other members are entitled to fire him and fire him they did, separate and apart. . . .  He's going to get his share of the corporation; it's going to be tendered to him . . . .  They fired him

3

and they don't want him back. . . . The 75% ownership can stop his salary. They can stop his benefits. They can do anything they want to do.

¶7. The chancellor granted a preliminary injunction and appointed Havard to "oversee the financial affairs of the LLCs." The court ordered that Havard was to have "unlimited access to the financial records of the company on the premises" and that the records "may be made available to the plaintiff." The court's order further provided:

> The defendants may continue with the normal operations of business and payment of expenses in the ordinary course of business so long as the CPA is aware of and approves of the regular operating expenses by signature. . . . No members of the LLCs may pay themselves salaries, distributions, draws, expense reimbursements, or any other funds or income of any kind without court approval. Any accounts or other income currently possessed by the LLCs may be used for payment of owed expenses per CPA approval, but will not be used for payment to the members absent court approval.

*June 26, 2006, Order*

¶8. On April 10, 2006, Williford's counsel posted a letter to Havard, asking about the financial information the chancellor had ordered produced. Havard replied that he had, more than a month earlier, requested "a list of the pending jobs, the current status, and projected gross profit of these jobs (if awarded) as well as the status at January 31, 2006," but that he had "yet to receive that information back."

¶9. On June 7, 2006, still without the financial information, Williford's counsel filed a motion to compel compliance with the chancellor's prior order. Defendants' counsel responded:

> I am meeting with my clients later this week and we will determine all the issues then, but in the meantime for your information, I am informed that they no longer wish to purchase Mr. Williford's shares.

4

¶10. On June 26, 2006, following a June 21, 2006, conference with the parties, the chancellor entered an order compelling the defendants to provide the information "within twenty (20) days of the conference." The court also replaced Havard with Nancy Carpenter, CPA, "as the accountant to oversee the financial affairs of the LLC defendants."

¶11. On July 20, 2006, Carpenter requested information from both Williford and the defendants. Having received no response from Defendants by August 10, Carpenter reported to the court:

> To date I have received information from Mr. Williford, however; the other parties have not provided any information. I have talked with [defendants' counsel] who advised information would be forthcoming. I have called and sent facsimile correspondence to [defendants' counsel] and have been unable to talk with him this week.

¶12. On August 16, 2006, Defendants served what purported to be responses to Williford's discovery requests. However, the responses were evasive and provided virtually no information. For instance, the first interrogatory and response stated:

> INTERROGATORY NO. 1: List the name, address, and telephone number of all persons known to you or believed by you to have knowledge of any discoverable matter in this cause.[1]
>
> RESPONSE NO. 1: Bluewater objects to this interrogatory because counsel for Bluewater does not know what it means and calls for legal knowledge and a legal conclusion on the part of the respondent.

¶13. In a letter to Defendants' counsel yet again requesting the court-ordered information, Williford's counsel – referring to the evaluation Carpenter was to provide – stated: "I think

---

[1] *See* Miss. R. Civ. P. 26 (b)(1) ("Parties may obtain . . . the identity and location of persons (1) having knowledge of any discoverable matter or (ii) who may be called as witnesses at the trial. . . .")

it would be in the best interest of all the shareholders to see her evaluation. Do you agree?"

Defendants' counsel responded on August 21:

> I met with the three stockholders in Bluewater last week. Based on that meeting, let me reiterate what I had already told you: **The offer to purchase Mr. Williford's stock is withdrawn. His firing as an employee is affirmed and confirmed.**
>
> Since there is no offer to purchase his stock and since there is no requirement that the stock be purchased, an evaluation of the LLC is irrelevant and [there] is no necessity for Nancy [Carpenter] to evaluate anything, so at this point I need not take up the issues of the information requested by her and confidentiality. The answer to your query and statement: (". . . and I think it would be in the best interest of all the shareholders to see her evaluation. Do you agree? . . . .") is **NO.** As an aside, I am not much interested in what you think; but aside from that fact, not only does the best interest of the shareholders have nothing to do with this litigation, an evaluation by Nancy [Carpenter] is unnecessary, useless, and irrelevant because the offer to purchase Mr. Williford's stock is withdrawn.

(Emphasis in original.)

¶14. Defendants' counsel followed up the letter with a motion asking the court to dissolve, in part, the preliminary injunction. The primary argument was that, because defendants had withdrawn their offer to purchase Williford's stock, the suit was moot. The motion also claimed: "A minority shareholder has no right to dictate or oversee or affect the operation of an LLC."

*February 8, 2007, Order*

¶15. On August 23, 2006 – having received neither the court-ordered information nor proper responses to discovery – Williford's counsel filed a motion for contempt and for an order compelling Defendants to provide the requested, court-ordered, information. On September 11, 2006, the chancellor entered an agreed order temporarily staying all

6

proceedings. The order stated that the parties had agreed to a procedure for appraisal of the LLCs; that the court's previous orders were still in effect; and that Defendants were to provide the information Carpenter previously had requested. Specifically, Defendants were to provide her "any and all other financial records, as she deems necessary, to determine a fair market value of the Bluewater entities."

¶16. On November 10, Carpenter posted a letter to the parties, pointing out that most of the requested information had not been provided, and requesting that the documents be provided "no later than noon on Friday, November 17, 2006." Because the information still had not been provided a month later, Williford filed yet another motion for contempt, and Carpenter followed up on January 8, 2007, with another request for the documents. She had received no reply as of January 24, so Williford's counsel filed "Plaintiff's Renewed Motion to Compel and Motion for Contempt," asking the court to go forward with a hearing and to take testimony from Carpenter.

¶17. When the chancellor heard the motion on February 6, Carpenter's testimony clearly established that Defendants had failed to comply with discovery and the court's previous orders. On one occasion during the hearing, the chancellor – referring to documents that had not been provided – vented his frustration to the defendants' counsel:

> And for any party to make a promise to this court that they're going to in good faith – and I'm troubled by it – because I do not see good faith on the part of your clients. . . . If they were not going to do that, act in good faith, don't make a promise and get it under my signature because the court is duly antagonized, aggravated and upset because it doesn't take motion after motion, contempt after contempt, a request for it in order to get a party to comply . . . .

7

¶18.    The chancellor entered an order on February 8, holding Defendants in contempt and sanctioning them. He ordered them to pay – no later than February 12, 2007 – $750 in attorney fees to Williford's counsel. Rather than pay the sanction on February 12, as ordered, Defendants waited until February 16, and then filed a motion requesting the court to "set aside, alter or amend" its February 8, 2007, order.

*March 8, 2007, Hearing*

¶19.    Williford's counsel responded by filing another motion for sanctions, informing the court that the sanctions previously ordered had not been paid. Counsel for all parties appeared before the chancellor on March 8, 2007. But rather than respond to the motion for additional sanctions, Defendants' counsel argued that counsel for Williford should not be allowed to proceed on his motion for additional sanctions because he had not properly noticed the motion.

¶20.    After much argument and discussion by the parties – and an utterly amazing display of patience and judicial temperament by the chancellor – counsel for Defendants agreed that his clients would pay the sanction within seven days, and the matter was set for trial. The record does not reflect whether Defendants paid the sanctions.

*The Trial*

¶21.    When the matter proceeded to trial, Carpenter testified that the value of Williford's interest, as of the date of the ouster, was $316,768.25. Havard's testimony was approximately the same. At the conclusion of the trial, the chancellor held for Williford against all Defendants, jointly and severally. He awarded Williford the value of his interest in the companies, together with five percent interest from the date of the ouster to the date

8

of judgment, for a total judgment of $340,760.25. He also ordered Defendants to pay Carpenter's bill in the amount of $4,386.63, and post-judgment interest on the judgment at the "statutory rate." Finally, the chancellor denied Williford's request for attorney fees.

¶22. Defendants appealed and Williford cross-appealed. The Court of Appeals reversed the judgment, holding that Bluewater successfully had rescinded its ouster of Williford and that the chancellor's award was beyond the scope of the pleadings. We disagree.

## ANALYSIS

*The Issues On Appeal*

¶23. Defendants present eight assignments of error and one issue concerning our standard of review. Williford's cross-appeal asserts the chancellor should have awarded him attorney fees. Finally, we address *sua sponte* the question of post-judgment interest. We condense and restate these issues as follows:

1.      Since the chancellor adopted verbatim the plaintiff's proposed findings of fact and conclusions of law, must this Court apply a different level of deference to the factual findings?

2.      Were the pleadings sufficient under our notice-pleading requirements to allow the chancellor to award the plaintiff the value of his interest in Bluewater?

3.      Did the chancellor have legal authority to award the plaintiff the value of his interest in Bluewater?

4.      Did the chancellor have legal authority to grant a judgment against the individual defendants?

5.      Did the plaintiff present facts sufficient to justify the chancellor's award?

6.      Did the chancellor err in concluding he had no authority to award attorney fees to the plaintiff?

9

7.      Did the chancellor err in granting post-judgment interest "at the statutory rate?"

**I.      This Court is not required to apply a different level of deference to the chancellor's factual findings.**

¶24.    We review a chancellor's legal conclusions de novo; that is, we reach our own conclusions as to the applicable law.[2]  But we ordinarily accept a chancellor's factual findings unless – given the evidence in the record – we conclude that the chancellor abused his or her discretion, and no reasonable chancellor could have come to the same factual conclusions.[3]

¶25.    But as to our review of the factual findings in this case, Defendants argue we must apply a different and higher standard of review because the chancellor adopted, verbatim, the plaintiff's proposed findings of fact and conclusions of law.  That may be so, and probably is – Williford responds to the argument without denying it.  But we cannot compare the two documents, because Williford's proposed findings of fact and conclusions of law were not included in the record.  Nevertheless, we shall address the issue.

¶26.    When a chancellor adopts verbatim, or nearly verbatim, a party's proposed findings of fact, our precedent provides that we should apply "heightened scrutiny"[4] to the chancellor's findings of fact.  This rule is fairly well-settled and accepted.  Yet our precedent

---

[2] ***Corporate Mgmt., Inc. v. Greene County***, 23 So. 3d 454, 459 (Miss. 2009).

[3] ***Limbert v. Miss. Univ. for Women Alumnae Ass'n, Inc.***, 998 So. 2d 993, 998 (Miss. 2008) (*citing* ***Hamilton v. Hopkins***, 834 So. 2d 695, 699 (Miss. 2003)).

[4] *See, e.g.,* ***In re Estate of Grubbs***, 753 So. 2d 1043, 1046-47 (Miss. 2000); ***Brooks v. Brooks***, 652 So. 2d 1113, 1118 (Miss. 1995).

provides little guidance as to how we are to comply with our duty to "heighten" our scrutiny – which could be read to require us to review a case more carefully or, perhaps, to apply a different, more stringent standard to our review of the facts.

¶27. But our duty already requires us carefully to scrutinize every case, so we reject the former. And as to the latter, if "heightened scrutiny" requires us to abandon the reasonable-chancellor standard and apply a different, higher standard, we find no caselaw or other authority explaining that different standard, or suggesting how it should be applied.[5] The dissent suggests that heightened scrutiny requires us to review a chancellor's findings with "a heightened 'sensitivity to the possibility of error. . . .'"[6] Yet our duty requires us in every case to be as careful and as sensitive to error as we can be, and we cannot condone a standard that allows us to be less sensitive to error in one case than in another.

¶28. In *Rice Researchers, Inc. v. Hiter*,[7] this Court provided the following interesting insight into the issue:

> Case complexities and crushing caseloads necessitate substantial reliance upon the submissions of trial counsel. Still, the judge is a judge and not a rubber stamp. He may not be able to afford the luxury of practicing his culinary art a la the Cordon Bleu. He should remember, however, that his oath precludes a McDonald's approach to the judicial process. Where the trial judge wholly abdicates his judicial responsibilities — where, as it were, he abuses his discretion — we doubtless have authority to intervene. Here the Chancery Court quite properly requested that each party submit proposed findings of fact and conclusions of law. These submissions were considered at an adversary hearing. Thereafter, the Court considered RRI's motion to amend findings.

---

[5] Some possibilities include elevating the standard from "reasonable chancellor" to "very reasonable chancellor," or from "manifest error" to "catastrophic error."

[6] Dissent at ¶80 *citing In re Estate of Grubbs*, 753 So. 2d 1043, 1048 (Miss. 2000).

[7] *Rice Researchers, Inc. v. Hiter*, 512 So. 2d 1259 (Miss. 1987).

11

These steps, coupled with the fact that this case is quite complex (in spite of its simplicity), leave us convinced that the Chancery Court acted within its authority. As indicated above, however, our obligation of appellate deference to such findings is necessarily lessened.[8]

¶29. The *Hiter* Court's "less deference" standard, the *Brooks* Court's "heightened scrutiny" standard, and the dissent's "heightened sensitivity" standard all suggest that this Court – if not completely, then to some unspecified degree – must become the finder of fact, imposing (again, to some degree) our own view of the facts. But that would be a tricky task – given that we never saw or heard the witnesses.

¶30. One thing is clear. Applying a "heightened-scrutiny" or "lessened-deference" standard would require us to abandon the traditional standard (accepting a chancellor's factual findings that the evidence supports), and employ some different standard. And although the new standard of review has been named ("heightened-scrutiny" or "less-deference"), this Court has yet to explain how it is to be applied.

¶31. While it is true that the United States Supreme Court has adopted various levels of scrutiny for particular kinds of cases – for instance, "intermediate-scrutiny" review of gender-based classifications[9] – the Court explains the difference in each level, and provides a specific test for its application.[10]

---

[8] *Id.* at 1266.

[9] *Craig v. Boren*, 429 U.S. 190, 218, 97 S. Ct. 451, 50 L. Ed. 2d 397 (1976).

[10] Intermediate scrutiny in gender-based discrimination cases requires that the challenged law or policy further an important government interest in a way that is substantially related to that interest. *Id.*

12

¶32. If we are to adopt and apply a "heightened-scrutiny" standard, simple fairness and justice requires us to publish that standard – in more than name – to the bench and bar. And because that has not been done – and because we decline to do it today – we shall continue to apply the familiar abuse-of-discretion standard to a trial judge's factual findings, even where the judge adopts verbatim a party's proposed findings of fact. And should a party suspect and suggest that the judge's factual findings are somehow tainted or untrustworthy, we hold that the party – upon proper proof – may seek a new trial.

¶33. In the case before us today, we find not one sliver of evidence that the chancellor's factual findings were untrustworthy or suspect. His bench opinion discussed his factual findings. And at the hearing on post-trial motions, he engaged in lengthy discussions with counsel concerning his view of the facts. Finally, his factual findings – whether or not identical to those submitted by the plaintiff – were supported by substantial evidence. So we are unable to say he abused his discretion, and this issue is without merit.

## II. The pleadings sufficiently alleged breach of contract and compensatory damages.

¶34. Defendants persistently have argued that Williford sought only injunctive relief, and that his pleadings did not justify the chancellor awarding him the fair-market value of his interest in Bluewater. For instance, in arguing post-trial motions, Defendants' counsel stated:

> This matter began with the filing on February 10, 2006, whereby Mr. Williford sought a preliminary injunction . . . . There was a brief in support of the preliminary and permanent injunction . . . . Those are the pleadings we went to trial on. There was no other relief asked for as far as Bluewater was concerned except that he remain a member of the LLC.

13

¶35. Mississippi has been a "notice pleading" state since January 1, 1982, when we adopted the Mississippi Rules of Civil Procedure.[11] Under Rule 8, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief," and "a demand for judgment."[12] "No technical forms of pleading or motions are required."[13] Moreover, "[a]ll pleadings shall be so construed as to do substantial justice."[14] Rule 54(c) states that

> every final judgment shall grant the relief to which the party in whose favor it is rendered is *entitled by the proof* and which is within the jurisdiction of the court to grant, *even if the party has not demanded such relief in his pleadings* . . . .[15]

¶36. Our decisions have reflected the shift from older forms of "code pleading" to the Rules' "notice pleading" paradigm. In *Pilgrim Rest Missionary Baptist Church v. Wallace*, we stated "it is axiomatic that the relief need not be limited in kind or amount by the demand but may include relief not requested in the complaint."[16] And in *Turner*, we stated: "A trial

---

[11] *Upchurch Plumbing Inc. v. Greenwood Utils. Comm'n*, 964 So. 2d 1100, 1117 (Miss. 2007) (*citing* Miss. R. Civ. P. 8 and cmt.).

[12] Miss. R. Civ. P. 8(a).

[13] Miss. R. Civ. P. 8(e)(1).

[14] Miss. R. Civ. P. 8(f).

[15] Miss. R. Civ. P. 54(c) (emphasis added).

[16] *Pilgrim Rest Missionary Baptist Church ex rel. Bd. of Deacons v. Wallace*, 835 So. 2d 67, 75 (Miss. 2003) (citing Miss. R. Civ. P. 54 cmt.; *Turner v. Terry*, 799 So. 2d 25, 39 (Miss. 2001); *Tuck v. Blackmon*, 798 So. 2d 402, 410 (Miss. 2001)).

14

judge may award a party any relief to which he is entitled, even if the party fails to make a specific demand for such."[17]

¶37.    In holding that the chancellor erred in granting Williford money damages, the Court of Appeals inexplicably relied on three prerules cases, two of which date to the 1850s.[18] We now overrule **Barnes**, **French**, and **Tucker** to the extent that they conflict with the requirements and provisions of the Mississippi Rules of Civil Procedure and subsequent decisions of this Court.

¶38.    We hold that Williford's complaint was clearly sufficient to support an award of monetary damages.  The complaint is titled "Complaint for Preliminary and Permanent Injunction and Damages."   The opening paragraph stated that Williford was seeking damages.  Paragraph 5 alleged the ouster was unlawful, "warranting equitable and monetary relief."  Count I of the complaint was titled "Breach of Contract" and alleged breach of contract, for which the remedy is compensatory damages.  In Count III, titled "Violation of the Mississippi Limited Liability Company Act," Williford asserted "all rights and remedies available under the applicable statute, Miss. Code Ann. § [79-29-101], *et seq*."[19]  Under the section titled "Damages and Relief Sought," Williford sought (among other things)

---

[17] *Turner*, 799 So. 2d at 39.

[18] *Barnes v. Barnes*, 317 So. 2d 387, 388 (Miss. 1975) ("It is a well settled rule that a party complainant may have relief only on the case made by his bill of complaint and that the allegations of the pleadings and proof must correspond."); *French v. Davis*, 9 George 218, 224 (Miss. Err. App. 1859) (under Statute of 1850, boilerplate claim for relief considered "surplusage" where not corresponding to facts pleaded); *Tucker v. Cocke*, 3 George 184 (Miss. Err. App. 1856) (relief erroneously granted where complaint was imprecisely framed).

[19] This includes Mississippi Code Section 79-29-306.   *See* Miss. Code Ann. § 79-29-306 (Rev. 2009) (giving the chancellor broad equitable power to enforce the LLC operating agreement).

compensatory damages, an accounting of all company assets, an appraisal of the fair-market value of his share of the company, and "any other relief to which he may be entitled."

¶39.    Viewed as a whole, we cannot say the chancellor was in error by finding that the complaint was sufficient to put Bluewater on notice that Williford was seeking monetary relief.  Accordingly, Defendants' argument that the chancellor granted Williford relief that was beyond the scope of the pleadings is without merit.

**III.    The chancellor had authority to award the plaintiff the value of his interest in the two LLCs.**

¶40.    On several occasions, the chancellor expressed concern about Defendants' conduct toward Williford, including their decision to lock him out of the company offices and prevent his involvement in company business.  Also, he voiced concern over the large sum of money ($1.2 million) that was unaccounted for during the time Williford was "fired" and locked out.

¶41.    For example, at the conclusion of trial, just before awarding Williford the fair-market value of his interest in the business, the chancellor stated in his bench opinion:

> It seems to the court that it would be grossly unfair to Mr. Williford to say after the passage of so much time that he could come back into the company, and in particular the court is concerned about the distribution of assets that were determined by both experts.  Even the company's own expert, Mr. Havard, determined that the company's value at that time was about 1.2 million dollars.

¶42.    Defendants zero in on the chancellor's use of the equitable term "unfair," characterizing it as proof he exceeded his legal authority by awarding Williford the fair-market value of his interest.  There is no law, they argue, that allows a chancellor to award a money judgment on a "finding of inequity" or "not being fair."  They also claim

16

Mississippi's Limited Liability Company Act does not allow such a remedy. On this point, they are incorrect.

¶43. While it is true that equitable principles ordinarily are not applied under contract law, this is not unheard of. For instance, rescission is an equitable remedy available in certain contract cases,[20] and promissory estoppel is a quasi-contract remedy.[21] But more importantly, the Legislature is free to establish, as a matter of substantive law, any contract remedy it finds appropriate.

*Mississippi Limited Liability Act*

¶44. In 1994, the Legislature authorized the formation of limited liability companies in Mississippi.[22] Persons who form one of these legal entities – commonly known as an LLC – are allowed to enter into a contract called a limited liability company agreement[23] "to regulate or establish the affairs of the limited liability company, the conduct of its business, and the relation of its members."[24]

¶45. Although an LLC operating agreement is a contract, subject to contract law, the Act specifically allows a chancellor to "enforce a limited liability company agreement by injunction or by such other relief that the court in its discretion determines to be fair and

---

[20] *See, e.g.,* ***Turner v. Terry***, 799 So. 2d 25, 36 (Miss. 2001).

[21] *See, e.g.,* ***Satellite Tracking of People, LLC v. G4S PLC***, No. 3:08-cv-0126, 2009 WL 2983032, at *6 (M.D. Tenn. Sept. 14, 2009).

[22] Mississippi Limited Liability Company Act (the "Act"), Miss. Code Ann. §§ 79-29-101 to 79-29-1201 (Rev. 2009).

[23] Miss. Code Ann. § 79-29-103(k) (Rev. 2009).

[24] Miss. Code Ann. § 79-29-306(1) (Rev. 2009).

appropriate in the circumstances."[25]  This language clearly established the chancellor's authority to award Williford the fair-market value of his interest in the LLCs.  We therefore find that this issue has no merit.

**IV.  The chancellor had authority to grant a judgment against the individual defendants.**

¶46.  Defendants argue that the chancellor had no authority to grant judgments against them as individuals.  Under the Act, members of a limited liability company (such as Bluewater) normally are not individually liable for the obligations of the LLC.[26]  But because the members may modify this rule in the operating agreement,[27] they may agree among themselves to be individually liable.

¶47.  The Act also says that – subject to certain exceptions inapplicable here – an LLC's operating agreement may address the liability of the individual members for "any action taken, or any failure to take any action, as a manager or member . . . ."[28]  So we must look to the operating agreements to see whether – and to what extent – they limit the individual defendants' liability.

---

[25] Miss. Code Ann. § 79-29-306(3)(a) (Rev. 2004).

[26] Miss. Code Ann. § 79-29-305(1) (Rev. 2009) ("A person who is a member of a limited liability company is not liable, by reason of being a member, under a judgment, decree or order of a court, or in any other manner, for a debt, obligation or liability of the limited liability company, whether arising in contract, tort or otherwise or for the acts or omissions of any other member, manager, agent or employee of the limited liability company.").

[27] Miss. Code Ann. § 79-29-305(3) ("Notwithstanding the provisions of subsections (1) and (2) of this section, under a limited liability company agreement . . . a member or manager may agree to be obligated personally for any or all of the debts, obligations and liabilities of the limited liability company.").

[28] Miss. Code Ann. § 79-29-403 (Rev. 2009).

¶48.    Both LLCs' operating agreements included the following provision:

Liability of the Members.    No Member shall be liable, responsible or accountable in damages or otherwise to any other Member or to the Company for any act or omission performed or omitted by him except for acts of gross negligence or intentional wrongdoing.

¶49.    This provision – agreed to by all members – clearly establishes the chancellor's authority to hold the individual defendants personally liable for acts of gross negligence or intentional wrongdoing.  And in his Findings of Fact and Conclusions of Law, the chancellor stated that the

failure of the individual defendants to pay Williford his one-quarter interest despite agreement to do so constitutes a willful and intentional breach of contract and is grossly negligent. . . .  The intentional breach of contract and gross negligence by the individual defendants, the court so finds, is sufficient to render the individuals liable in addition to the liability of the limited liability companies.  The court had the opportunity to consider all of the evidence including the testimony of all of the defendant witnesses who testified on the witness stand, and the court had the opportunity to judge their credibility.

*Fought v. Morris*

¶50.    The chancellor's final judgment as amended cites our decision in ***Fought v. Morris***[29] for the proposition that it would be inequitable to allow the Bluewater super-majority to prevent Williford from participating in the company's business, while claiming he remains a viable member.  We agree with the chancellor's application of ***Fought*** to these facts.

¶51.    In ***Fought***, we held that "in a close corporation where a majority stockholder stands to benefit as a controlling stockholder, the majority's action must be 'intrinsically fair' to the

---

[29] ***Fought v. Morris***, 543 So. 2d 167 (Miss. 1989).

19

minority interest."[30]  While the Bluewater companies are limited liability companies and not corporations, the rationale of *Fought* applies with equal force.

¶52.    A closely held corporation "is a business entity with few shareholders, the shares of which are not publicly traded."[31]  Our decision in *Fought* overruled the traditional rule that "squeeze-outs" or "freeze-outs" in close corporations do not constitute breach of duty or good faith between shareholders.[32]  In so doing, we observed that

> often close corporations consist of friends or family members where the directors, officers and shareholders are synonymous.  Each contributes his or her capital, skill, experience, and labor to the company.  Management and ownership are substantially identical.  Each shareholder has an inside view of the company's operations and maintains an element of trust and confidence in each other which is commonly lacking in a large or publicly-held corporation.[33]

¶53.    All of these factors are present in this case.  Accordingly, the Bluewater members had a duty to one another and to the LLCs,[34] a duty that the Bluewater super-majority breached by improperly squeezing Williford out of the companies.

¶54.    Because of the Act's provision, the agreement of the parties, and the authority cited above, we find this issue has no merit.

**V.      The record includes a sufficient factual basis for the chancellor's judgment.**

---

[30] *Id.* at 171.

[31] *Id.* at 169.

[32] *Id.* at 171.

[33] *Id.*

[34] *See Champluvier v. State*, 942 So. 2d 145, 155 (Miss. 2006) (Randolph, J., dissenting).

¶55. The chancellor found that Defendants had breached the Bluewater operating agreements in a willful, grossly-negligent manner. Both operating agreements provided that

> [t]he company may, by a 75% Super Majority Vote of the members redeem any Members Interest [sic] for it's [sic] then fair market value if the company determines in its sole and absolute discretion, that that member has either committed a felony or under any other circumstances that would jeopardize the company status as an approved government contractor.

¶56. Despite the agreements' provision that a super-majority ouster was allowed only when the member to be ousted had committed a felony or had jeopardized the company status as an approved government contractor, Defendants' ouster notice alleged neither. The ouster notice informed Williford that, on January 31, 2006, at 1500 hours, "his status as a partner of Bluewater . . . ha[d] been terminated," and that he would be paid one-quarter of the fair-market value of Bluewater.

¶57. Only after Williford filed suit did Defendants attempt to reverse their super-majority decision. They took the position that they had not really exercised their super-majority rights, but had only made an "offer" which they had decided to withdraw. When their counsel argued that, even though Williford was "fired," he was still a member of the LLCs, the chancellor asked him: "How can you fire an owner or a stockholder?" Counsel replied, "It's easy, Judge. He's an employee . . . ."

¶58. Defendants' position does not square with the facts or the law. Their notice and actions clearly were not consistent with an "offer" that later could be withdrawn. For instance, in the notice, they characterized the ouster as a thing that already had been accomplished – even providing the exact date and time ("January 31, 2006 at 1500 hours") that Williford's "status as a partner of Bluewater" had been "terminated."

21

¶59.    Of more concern, however, were Defendants' other actions that were wholly inconsistent with Williford's rights as an LLC member.  They changed the locks on the doors of the offices and notified Williford that "as of January 31, 2006 he [was] to cease and desist from performing any business on behalf of Bluewater."  He was to

> refrain from use of any and all company assets, including, but not limited to the use of the company name, bank account, tax identification number, business address . . . Nextel Blackberry . . . Dell . . . laptop, any real or intellectual property of Bluewater . . . or any other asset named or unnamed of Bluewater . . . .

¶60.    Defendants argue, without any citation of authority, that they were authorized to change their minds and allow Williford to remain an LLC member while, and at the same time, to "fire" him and exclude him from any involvement in the LLCs' business.  While their argument might apply to other types of legal entities, it has no application to member-managed LLCs.

¶61.    Unless the members of a Mississippi LLC employ or appoint a manager to manage the LLC's business affairs, "every member is an agent of the limited liability company for the purpose of conducting its business and affairs . . . ."[35]  The operating agreements of both Bluewater LLCs stated:  "The management of the Company's business shall be vested in the members."

¶62.    So, according to the statute and the operating agreement, Williford – as a member of both LLCs – was entitled to participate in the management of both LLCs, and he could not be "fired."  Defendants could have removed him as a manager only by amending the

---

[35] Miss. Code Ann. § 79-29-303(1) (Rev. 2009).

operating agreements. But both operating agreements specifically prohibited amendment without "consent of all Members,"[36] which would have required Williford's vote.

¶63. An LLC operating agreement is contractual in nature and binding on the members of the company.[37] Bluewater's ouster of Williford was a formal company action taken according to the terms of the LLC operating agreement. The chancellor found that "[t]he Court was not provided with any credible official action taken by the company shareholders revoking its decision to pay Williford his twenty-five (25%) interest."

¶64. The Court of Appeals found that "the remaining members communicated the rescission of the ouster to Williford multiple times" in the form of letters their attorney sent well into the litigation, as well as by a motion to dissolve the injunction which "clearly rescinded Williford's ouster." We disagree.

¶65. Neither Bluewater nor the Court of Appeals identified any authority that allowed Bluewater unilaterally to rescind Williford's ouster after it had invoked the "Right of Redemption" provision of the LLC operating agreement. Bluewater repeatedly has argued in terms of "withdrawing its offer to purchase Williford's shares." But framing the issue in these terms does not square with the action Bluewater took.

---

[36] Both LLC operating agreements contained an "Entire Agreement/Amendment" clause which provided in pertinent part: "This Agreement constitutes the entire understanding and agreement among the parties with respect to the subject matter of this Agreement. . . . This Agreement may not be amended or modified except with the consent of all members."

[37] *Kinkle v. R.D.C., L.L.C*, 889 So. 2d 405, 409 (La. Ct. App. 2004) (LLC operating agreement contractually binding on members, and rules of contractual construction apply). *See also* 54 C.J.S. *Limited Liability Companies* § 18 (2010); Am. Jur. 2d *Limited Liability Companies* § 3 (2010).

¶66. By exercising the "Right of Redemption" provision in the operating agreement, the majority members of Bluewater were not merely making Williford an offer to purchase his shares; they were invoking their *right* to purchase his shares. In contract terms, Bluewater's action was analogous to the exercise of an option contract rather than an offer which could be rescinded later.[38] In short, because there was no offer for Williford to accept, there was no offer for Bluewater to rescind. And because the operating agreement contained no provision permitting the majority members unilaterally to rescind the action, Williford's ouster could have been undone only by an official company action.[39]

¶67. But Defendants' argument fails for another reason. When they decided to exercise the super-majority provision and buy Williford's interest in the LLCs – and assuming they were within their rights to do so – they could have made it effective either immediately, or at some future time. By choosing the former, they had every right to exclude him from the business, but they had a companion duty to tender payment to him. Had they chosen the latter, they had no right to exclude him from the business until they tendered payment.

¶68. Defendants chose the best of both options for themselves, and the worst for Williford. They locked him out and excluded him from all business affairs, and then later claimed they hadn't really decided for sure to purchase his interest. The chancellor found this to be a

---

[38] An option contract gives a clear right to the option holder, regardless of the wishes of the option giver. *Creely v. Hoseman*, 910 So. 2d 512, 520 (Miss. 2005) (citing *Duke v. Whatley*, 580 So. 2d 1267, 1272 (Miss. 1991)).

[39] The LLC operating agreement contains an "Entire Agreement/Amendment" clause which provides in pertinent part: "This Agreement constitutes the entire understanding and agreement among the parties with respect to the subject matter of this Agreement. . . . This Agreement may not be amended or modified except with the consent of all members."

willful, grossly negligent breach of contract, and we are unable to say the chancellor was manifestly in error. Therefore, this assignment of error is without merit.

## VI. The chancellor erred in concluding he had no authority to award attorney fees to the plaintiff.

¶69. Williford argues on cross-appeal that the chancellor erred in failing to award him reasonable attorney fees. While Williford is correct that attorney fees may be awarded in some cases of intentional breach of contract and breach of fiduciary duty,[40] that decision is within the chancellor's sound discretion.[41]

¶70. The chancellor did not find that Williford's demand for attorney fees lacked merit. Instead, he was of the opinion that he had no authority to award attorney fees. Specifically, he stated: "[T]he Court does not know of any authority that the Court has to authorize attorney's fees, so the Court does not approve attorney's fees for Mr. Williford." Thus, the question before us is a legal, rather than a factual, one.

¶71. Attorney fees generally are not available in breach-of-contract cases.[42] But we have recognized exceptions to this rule, either where attorney fees are provided for in the contract, or in the case of "conduct so outrageous as to support an award of punitive damages."[43]

¶72. On remand, the chancellor may consider an award of attorney fees to Williford. And if the chancellor decides not to award attorney fees, the decision must be based on the

---

[40] *Barnes, Broom, Dallas & McLeod, PLLC v. Cappaert*, 991 So. 2d 1209, 1214 (Miss. 2008) (citing *Garner v. Hickman*, 733 So. 2d 191, 198 (Miss. 1999)).

[41] *Browder v. Williams*, 765 So. 2d 1281, 1287 (Miss. 2000).

[42] *Garner v. Hickman*, 733 So. 2d 191, 198 (Miss. 1999).

[43] *Id.* (citing *Greenlee v. Mitchell*, 607 So. 2d 97, 108 (Miss. 1992); *Central Bank of Miss. v. Butler*, 517 So. 2d 507, 512 (Miss. 1987)).

25

chancellor's conclusion that attorney fees are not factually warranted, rather than the legally erroneous conclusion that they are not allowed.

**VII.  The chancellor erred in granting post-judgment interest "at the statutory rate."**

¶73.   We raise this issue *sua sponte*.  The chancellor awarded post-judgment interest at the "statutory rate."  For many years, Mississippi had a statutory rate of interest to be applied to judgments.[44]  However, in 1989, the Legislature amended the statute to provide that interest on judgments must be awarded "at a per annum rate set by the judge hearing the complaint from a date determined by such judge to be fair but in no event prior to the filing of the complaint."[45]

¶74.   We have addressed this issue in several opinions,[46] and do so again today, in an effort to alert the bench and bar to the change in the statute.  Under the statute, a two- or three-percent interest rate might sometimes be fair and reasonable, while, at other times, market conditions and other relevant factors might require the trial judge to set a higher rate.  Yet we note that many trial judges continue – without proof, protest or argument of counsel, or agreement of the parties – to award post-judgment interest at the eight-percent rate previously mandated by statute.  And when that happens, without objection, we are not inclined to raise or address the issue.

---

[44] Miss. Code Ann. § 75-17-7 (1975).

[45] Miss. Code Ann. § 75-17-7 (Rev. 2009).

[46] *See, e.g., **Stewart v. Prudential Life Ins. Co. of Am.***, 44 So. 3d 953, 958 n.1 (Miss. 2010); ***Watson v. Watson***, 882 So. 2d 95, 111 (Miss. 2004).

26

¶75. But in today's case, the chancellor did not award post-judgment interest at eight percent (the former statutory rate). Instead, he awarded post-judgment interest "at the statutory rate." Since there is no specific "statutory rate" for post-judgment interest, we must reverse the award of post-judgment interest and remand for a determination of post-judgment interest at a rate that complies with the requirements of the statute.

## CONCLUSION

¶76. We affirm the chancellor's $340,760.25 judgment against all Defendants and reverse the judgment of the Court of Appeals. We remand the case for a hearing on the issue of whether Williford is entitled to recover attorney fees and, if so, in what amount; and for a determination of a reasonable rate of post-judgment interest.

¶77. **THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE JUDGMENT OF THE CHANCERY COURT OF FORREST COUNTY IS REINSTATED AND AFFIRMED. THIS CASE IS REMANDED TO THE CHANCERY COURT FOR PROCEEDINGS CONSISTENT WITH THIS OPINION**.

**CARLSON, P.J., RANDOLPH, LAMAR, KITCHENS AND CHANDLER, JJ., CONCUR. GRAVES, P.J., CONCURS IN RESULT ONLY. WALLER, C.J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED BY PIERCE, J.**

**WALLER, CHIEF JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶78. Because I disagree with the majority opinion addressing Issue I procedurally and substantively, I concur in part and in result with an otherwise excellent opinion.

## I. Standard of Review

¶79. Bluewater asserted on appeal in Issue I that this Court does not have to give deference to the chancellor's factual findings as the chancellor had adopted verbatim Williford's proposed findings of fact and conclusions of law. The discussion need go no further, as

27

whatever Williford submitted to the trial court is not in the record. Notwithstanding the procedural bar, the majority then goes on to disregard our precedent on the "heightened-scrutiny" standard of review for certain limited decisions that are appealed to this Court. Bluewater did not provide the part of the record needed for us to determine whether a less deferential standard of review would be more appropriate. Miss. R. App. P. 28. All that we have is speculation that the chancellor did something (adopted Williford's findings verbatim) that is not supported in the appellate record before this Court. Therefore, we should find no merit in its argument without further discussion on the subtleties of standards of review. *See* Miss. R. App. P. 28; ***Wood v. Gulf States Capital Corp.***, 217 So. 2d 257, 273 (Miss. 1968).

¶80. While the majority's discussion of our standards of review is unwarranted, two points must be emphasized. First, the abuse-of-discretion standard does not apply in situations in which a chancellor adopts a party's proposed findings verbatim. Maj. Op. ¶32. ***City of Jackson v. Spann***, 4 So. 3d 1029, 1032 (Miss. 2009). We apply heightened scrutiny, and this less deferential standard is firmly embedded in our jurisprudence. Heightened scrutiny refers to appellate review with a heightened "sensitivity to the possibility of error. . . ." ***In re Estate of Grubbs***, 753 So. 2d 1043, 1048 (Miss. 2000). In other words, the Court still defers to the chancellor's findings but with a closer examination of the record. *See **id.***

¶81. I agree with the majority that we must carefully review cases and remain sensitive to errors. Maj. Op. ¶27. No one disputes that. However, the issue is what deference chancellors should be afforded in their factual decisions when the record calls into question the independent findings our trial judges are obligated to make. Deferring to a chancellor's

28

factual findings does not mean that we intend to neglect our judicial function. *See Ralph Walker, Inc. v. Gallagher*, 926 So. 2d 890, 893 (Miss. 2006).[47]

¶82.  Second, the abuse-of-discretion standard is not limited to allowing a party a new trial upon proof that a chancellor's factual findings are "tainted or untrustworthy." Maj. Op. ¶ 32. *Powell v. Campbell*, 912 So. 2d 978, 981 (Miss. 2005). This Court defers to a chancellor's findings unless the chancellor was "manifestly wrong, clearly erroneous, or applied the wrong legal standard." *Id.*

## II.  Notice Pleading

¶83.  Even though the Court of Appeals improperly relied on *Barnes*, *French*, and *Tucker*, those cases should not be overruled. Maj. Op. ¶ 37. They support the practice codified in our current procedural rules.

¶84.  *Barnes* and *French* show that a party is entitled to what she proves at trial. In *Barnes*, we reversed the grant of exclusive possession of a couple's land to the husband because the chancellor made the award without any proof at trial. *Barnes v. Barnes*, 317 So. 2d 387, 388-89 (Miss. 1975). Today, we would have reached the same result had a chancellor awarded a spouse marital property without proper *Ferguson* findings. *Ferguson v. Ferguson*, 639 So. 2d 921 (Miss. 1994). *See, e.g., Reddell v. Reddell*, 696 So. 2d 287, 288 (Miss. 1997) (failure to classify wife's pension as marital asset reversible error). In *French*,

_____

[47]By way of comparison, in the federal context, the federal courts of appeals apply a clearly-erroneous standard of review to district courts' factual findings. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573-74, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985). This deferential standard recognizes that the reviewing court stands in an inferior position to decide factual issues de novo. *Id.* at 573.

this Court (then known as the High Court of Errors and Appeals of Mississippi) held that the plaintiff was entitled to judgment in the amount of his actual loss rather than the lesser specific amount he had requested in his complaint. *French v. Davis*, 38 Miss. 218, 1859 WL 3683, *4 (Miss. Err. & App. 1859).

¶85.     Finally, *Tucker* involved a lower court's order for Jane Buckingham to account for trust-estate profits she had earned during the time frame that she had controlled and managed trust property. *Tucker v. Cocke*, 32 Miss. 184, 1856 WL 2657, **1-2 (Miss. Err. & App. 1856). For reasons inapplicable today, Buckingham could not have been held liable. *Id.* at *3. Thus, the issue there was not so much that the Tuckers were denied relief that was outside the scope of their complaint. *See id.* Rather, the lower court had granted the Tuckers relief to which they were not legally entitled. *Id.* at **2, 4.

¶86.     Here, Williford's complaint clearly alleged breach of contract and requested compensatory damages. The chancellor awarded Williford the damages that he proved at trial. Because the result here does not conflict with principles in *Barnes*, *French*, or *Tucker*, these cases should not be overruled. Thus, I respectfully concur in part and result only.

**PIERCE, J., JOINS THIS OPINION.**