# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2025-CA-00020-COA

**ANDREW FAILLA AND ANTHONY FAILLA**                    **APPELLANTS**

**v.**

**DAVID P. FAILLA AND CINDY R. FAILLA**                    **APPELLEES**

DATE OF JUDGMENT:             12/16/2024
TRIAL JUDGE:                  HON. RHEA HUDSON SHELDON
COURT FROM WHICH APPEALED:    PEARL RIVER COUNTY CHANCERY
                              COURT
ATTORNEY FOR APPELLANTS:      JAMES L. GRAY
ATTORNEY FOR APPELLEES:       MEGAN LARMANN ABNEY
NATURE OF THE CASE:           CIVIL - REAL PROPERTY
DISPOSITION:                  REVERSED AND REMANDED - 03/17/2026
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., LAWRENCE AND LASSITTER ST. PÉ, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1.     Joseph Failla owned land in Pearl River County, Mississippi, and deeded several parcels to his sons, David, Andrew, and Anthony.  Joseph provided an express right-of-way easement in the warranty deed to ensure that David would be able to access his land across Andrew's land.  In approximately 2016, David placed a gate "across the right-of-way" on Andrew's land.  Andrew asked David to remove the gate; David refused.  Eventually, their brother Anthony removed the gate and informed Andrew.  Andrew filed a petition for a prohibitive injunction and assessment of costs and attorney's fees against David and his wife, Cindy, to prohibit them from obstructing the easement by placing a gate across it. The trial court found the presence of the locked gate was a minimal inconvenience and denied and

dismissed Andrew's petition with prejudice. Aggrieved, Andrew and Anthony appealed, arguing that David and Cindy did not have the right or incidental right to place a fence, chain, or other obstruction on the right of way to impede the use of this land.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2. On September 7, 2023, Andrew Failla filed a petition for a prohibitive injunction and assessment of costs and attorney's fees against his brother David Failla and sister-in-law Cindy Failla. In his petition, Andrew, the servient tenant under the express easement, alleged that beginning in 2016, David and Cindy installed a gate that obstructed his land and the other landowners behind it from accessing their property via the easement.

¶3. On October 13, 2023, David and Cindy filed their affirmative defenses, answer, and counterclaims. David and Cindy alleged that the parties had maintained a gate since 1998 for security purposes, and no complaint had been made about the gate until 2018. David and Cindy brought two counterclaims. First, they argued conversion and claimed that Andrew or Anthony removed and took possession of the gate that they placed on the easement. David and Cindy also filed a motion for joinder of a party, seeking to add Anthony as a cross-defendant to assert the conversion claim against him. In their second counterclaim, David and Cindy argued that they had "an implied right to continue maintaining a gate for security purposes" since a gate has been erected on the property since 1998.

¶4. On January 24, 2024, the chancery court entered a temporary order requiring Andrew and Anthony to return the gate they removed from the easement to David and Cindy and

prohibited David and Cindy from reinstalling the gate.[1]

¶5.　On June 7, 2024, Andrew filed a motion for a citation of contempt and for sanctions against David and Cindy for placing a "chain across the easement in direct violation of the [t]emporary [o]rder." The motion allegedly was not heard until trial, which was held on September 4, 2024.[2]

¶6.　At trial, Andrew testified that his father, Joseph, conveyed several parcels of that land to his children over the years and granted each child nonexclusive access to their land by easement from State Highway 43 South in Picayune, Mississippi, "so that nobody would be landlocked." In 1995, Joseph conveyed a 10.75-acre plot to his son David and David's wife, Cindy. Andrew testified that on May 10, 2012, his father conveyed him and his brother Anthony the portion of the property on which the right of way ran. Andrew explained that at the time his father conveyed the land to them, a gate was on the property, but Andrew did not have a key to the gate and had never been given one. During Andrew's testimony, he discussed a document labeled "Grant of Use of Right of Way and Act of Clarification of Instrument No. 201007846," which was signed and dated by Joseph on January 24, 2015.

---

[1] The chancery court ultimately ordered Andrew and Anthony to return the gate within seven days of the court's December 2024 final judgment, and the court otherwise denied David and Cindy's counterclaim for conversion. The parties do not challenge these rulings on appeal.

[2] On appeal, Andrew and Anthony state that the chancellor failed to find David and Cindy in contempt and request this Court to reverse and remand for consideration of sanctions for violating the temporary order. But Andrew and Anthony cite no legal authority supporting their suggestion that the chancellor committed reversible error. *See* M.R.A.P. 28(a)(7) (requiring appellate arguments to contain the "citations to the authorities, statutes, and parts of the record relied on"); *see, e.g.*, *Diaz v. Bounds*, 989 So. 2d 953, 955-57 (¶¶3-5, 11-14) (Miss. Ct. App. 2005).

The document clarified Joseph's intention regarding the easements previously granted to his children. He wrote that he "grants the unlimited use and access of the following described right-of-way to all of his descendants who own property adjoining any part of said right-of-way, said use of right-of-way shall run with the properties in perpetuity, and which right-of-way consisted of 3 parcels."

¶7.     In 2016, Andrew had an attorney send David a demand letter requesting that he remove the gate. Approximately two years after the demand letter was sent, David had not removed the gate. Anthony "removed the gate" and set it on the side of the road. David then put the gate back across the right of way.

¶8.     Andrew testified that in July 2023, he "took a copy of the [demand] letter . . . put it in a Ziplock bag, and . . . posted it on the fence post" where the gate was hanging. Andrew explained that when David failed to remove the gate for the second time, his brother Anthony again removed the gate. Anthony "decided to . . . take [the gate]" to his house. In response, David blocked the right of way by parking his car where the gate had previously been located. Andrew called the sheriff to have David remove the car. The next day, David placed a chain across the easement. Andrew also testified that in January 2024, the chancery court entered a temporary order requiring the chain to be removed, but the chain remained until Anthony filed a motion for contempt.

¶9.     Andrew explained that he does not want the gate on his property because he does not want to have to "get in and out" of his vehicle every time he arrives on his property. He also explained that he was concerned that the gate would affect the resale value of his property.

4

Lastly, he testified that the gate is located on property he owns and that he pays the taxes on that property where the gate was installed.

¶10. Anthony also testified. In his testimony, he explained that he would have to "take the gate off the hinges and open it up" in order to enter his property because he did not have and was never given a key to the gate. He explained that the gate was "on [his] property line." Anthony testified that in 2023, he removed the gate and "brought it to [his] house" because "the gate was not [David's]." Anthony explained that he "felt [he] had a right to the gate because" it "was [his] dad's gate," Anthony "was in the will," and "[David] was left out of the will." In January 2024, Anthony returned the gate to David as the court had ordered.

¶11. The defense called David to testify. He testified that he lived on the land that his father conveyed to him, and Andrew and Anthony do not have houses or live on the portion of the property their father conveyed to them.

¶12. David explained that when the right-of-way road was being built in 1995, his father requested him to "place[ a gate] at the front of the property" near Highway 43. David's father "picked the location of where it was going to go." David testified that "Anthony was given keys [to the gate] back around 2007 [or] 2008." He also testified that he provided keys to the gate to his father and other family members.

¶13. David testified that around 2012, he moved the gate farther back on the property because when his daughter first started driving and had to unlock the gate to get onto the property, "people [were] constantly honking at her." David explained that after he moved the gate back, he moved it a second time and placed it slightly closer to the highway in order

5

for vehicles to be able to turn around because "there [were] issues with people coming in and out" of their property "and not being able to get out, because there was no turn."

¶14.    David testified that he wanted the gate for security purposes. He explained that there "was an incident with [his] daughter that highlighted a lot of insecurities around the area; sexual predators basically what it boiled down to."

¶15.    Cindy also testified. In her testimony, she stated that she "do[es not] feel safe [and] never had issues when the gate was locked." Cindy explained that she takes care of her eighty-four-year-old mother and two-year-old granddaughter at her house. Cindy testified that "since [they] have no gate" she now takes care of her mother and granddaughter at her mother's house "because [she] just do[es not] feel safe" when David is working and not at home. She had security concerns before the gate was in its current location because "kids . . . used to go back [in the property] and . . . park." On another occasion, a man and his family were "on [the] driveway" and "were using the restroom" on the property. Cindy also explained that their cars have "been hit" five different times when they are "just coming in and out of the driveway" by people who do not live on the land. "Two of the times" when they got into an accident in their driveway, "the cop told [Cindy] to take [her] kids home because the people that hit [them] were meth heads, and [the officer] was afraid for the kids to be there."

¶16.    Cindy testified that these security concerns would be fixed by placing the gate where it was before the trial because it is not directly on Highway 43—so cars are not honking at her daughters—and it is not too close to their property—so there is a place where cars can

turn around if they need to once they get to the gate.

¶17. On December 16, 2024, the chancellor found that "while having a gate present may be a minimal inconvenience, it is not an interference to the use of the easement so as long as keys and/or passcodes to any locks are provided to all easement holders." Therefore, the chancellor found David and Cindy had a right to place a gate across the easement. Andrew and Anthony appealed, asserting that the trial court committed reversible error in this case by granting David and Cindy the right to erect a gate or chain across their express easement for the purpose of alleviating their concerns for privacy and safety.

**STANDARD OF REVIEW**

¶18. The Court's "review of a chancellor's findings of fact is the manifest error/substantial evidence rule." *Biddix v. McConnell*, 911 So. 2d 468, 474 (¶17) (Miss. 2005) (quoting *Miss. State Tax Comm'n v. Med. Devices Inc.*, 624 So. 2d 987, 989 (Miss. 1993)). "Under that test, we will not reverse unless the chancellor's findings of fact are manifestly wrong or clearly erroneous[,] or the chancellor applied the wrong legal standard." *Thornton v. Purvis*, 305 So. 3d 1173, 1178 (¶22) (Miss. Ct. App. 2020) (citing *Darnell v. Darnell*, 234 So. 3d 421, 423 (¶4) (Miss. 2017)). "We will 'accept a chancellor's factual findings unless—given the evidence in the record—we conclude that the chancellor abused his or her discretion, and no reasonable chancellor could have come to the same factual conclusions.'" *Id.* (citing *Bluewater Logistics LLC v. Williford*, 55 So. 3d 148, 155 (¶24) (Miss. 2011)).

**ANALYSIS**

¶19. "An easement may be acquired by express grant, implied grant (implication), or

7

prescription, which presupposes a grant to have existed." *TransMontaigne Op. Co. L.P. v. Loresco I LLC*, 361 So. 3d 89, 92 (¶14) (Miss. 2023) (quoting *Dethlefs v. Beau Maison Dev. Corp.*, 511 So. 2d 112, 116 (Miss. 1987)). "Where **private right of way** exists, the **owners** of the **dominant and servient tenements** must **each use the way** in such a manner as **not to interfere** with one another's utilization thereof." *Rowell v. Turnage*, 618 So. 2d 81, 86 (Miss. 1993) (emphasis added) (quoting *Lindsey v. Shaw*, 210 Miss. 333, 49 So. 2d 580, 584 (1950)). Without an express easement, whether a servient owner may "erect and maintain gates, bars, or fences across or along the easement of way depends on the intention of the parties connected with the original creation of the easement, as shown by the circumstances of the case, the nature and situation of the property subject to the easement, and the manner in which the way has been used and occupied. This is a question of fact and is to be determined as such." *Id.* (citing 25 Am. Jur. 2d *Easement* § 91 (1966)).

¶20. Furthermore, "[i]t is well established that the same rules of construction apply to the construction of easement grants as apply to contracts." *See Tubb v. Monroe Cnty. Elec. Power Ass'n*, 912 So. 2d 192, 197 (¶17) (Miss. Ct. App. 2005) (citing *Sigal v. Mfrs. Light and Heat Co.*, 299 A.2d 646, 649 (Pa. 1973)). "The first step is to determine if the contract is ambiguous; if it is not, then it must be enforced as it is written, and parol evidence will not be considered." *Wells v. Price*, 102 So. 3d 1250, 1257 (¶23) (Miss. Ct. App. 2012) (citing *Epperson v. SOUTHBank*, 93 So. 3d 10, 16 (¶17) (Miss. 2012) (citing *Royer Homes of Miss. Inc. v. Chandeleur Homes Inc.*, 857 So. 2d 748, 752 (¶10) (Miss. 2003); *Turner v. Terry*, 799 So. 2d 25, 32 (¶16) (Miss. 2001))).

¶21. There are many relevant cases detailing the use by the dominant estate (in this case David and Cindy) or use by the servient estate (in this case Anthony and Andrew) that affects the other's use of a right-of-way. *See Bd. of Trs. of Univ. of Miss. v. Gotten*, 119 Miss. 246, 80 So. 522, 523 (1919) (holding that "every owner of lands has a perfect right to fence them, provided, of course, to do so **will not appreciably interfere** with vested rights of others" (emphasis added)); *Feld v. Young Men's Hebrew Ass'n of Vicksburg*, 208 Miss. 451, 459, 44 So. 2d 538, 540 (1950) (holding the right-of-way easement was for the stated purpose of "ingress and egress, and not as a parking space for vehicles except such parking **as may be reasonably necessary** for the loading and unloading of goods, wares and merchandise transported to and from appellants' building" (emphasis added)); *Lindsey*, 49 So. 2d at 584 (holding the right of an easement holder to remove overgrown tree branches that interfered with driving and walking along the roadway because these obstructions rendered the easement "practically useless and constitute an unreasonable interference" with the easement holder's use); *Crum v. Butler*, 601 So. 2d 834, 837-88 (Miss. 1992) (holding that "where the instrument specifically conveys a right of way, then the deed will be construed as intending to convey only an easement" (citing *New Orleans & Ne. R.R. v. Morrison*, 203 Miss. 791, 35 So. 2d 68 (1948))); *Kennedy v. Anderson*, 881 So. 2d 340, 346 (¶25) (Miss. Ct. App. 2004) (deciding in favor of express easement holder when servient estate owners prevented access, explaining that "[a]n easement for ingress and egress is a straightforward concept that encompasses surface use and whatever improvements and maintenance to the roadway that are necessary to permit continued travel" (quoting *Bivens v. Mobley*, 724 So. 2d 458, 464

9

(¶27) (Miss. Ct. App. 1998))).

¶22.    One case in particular offers guidance by comparison to the issue before us now.  In *Hobgood*, a pipeline company, Koch Pipeline Southeast Inc. (Koch), had an easement agreement from 1941 that allowed the company to build pipeline for transporting natural gas. *Hobgood v. Koch Pipeline SE Inc.*, 769 So. 2d 838, 840 (¶3) (Miss. Ct. App. 2000). Hobgood inherited the property on which Koch's easement ran.  *Id.*  Koch notified Hobgood that it intended to replace a 1941 line with a new pipeline.  *Id.* at (¶5).  Hobgood opposed the construction of the new pipeline and informed Koch not to come onto his property.  *Id.*  Koch brought a suit for injunctive relief to prevent Hobgood from interfering with the replacement and use of the pipeline.  *Id.*  The chancery court granted partial summary judgment in favor of the pipeline company with an injunction to permit Koch's full use of the easement.  *Id.* On appeal, Hobgood argued whether the phrase "the right of way and easement to construct, maintain and operate pipe lines and appurtenances thereto" in the granting clause of the easement gave the pipeline company "an unqualified use of the right of way for pipeline purposes, including the right to install whatever number of pipe lines it chooses whenever it chooses for transporting whatever products it chooses."  *Id.* at 843 (¶22).  This Court explained that

> the fact that the 1941 pipeline was constructed to carry one form of natural gas does not prevent Koch from transporting another form of natural gas in that line or any additional line built on the easement. **The servient estate does not suffer an additional burden** as a result of the transport of natural gas liquids as opposed to dry natural gas.

*Id.* at 844 (¶31) (emphasis added) (citing *Ball v. Am. Tel. & Tel. Co.*, 227 Miss. 218, 226, 86

So. 2d 42, 44 (1956) (holding that telephone company was not restricted from using its telephone and telegraph cable lines for television transmission, as no additional burden was placed on the servient estate by such transmission)).

¶23.    Here, the gate was originally placed by the parties' father, Joseph, when he and his wife were the sole owners of the property over which the easement runs.  When Joseph conveyed a portion of his land to David and Cindy, the deed was expressly subject to a non-exclusive right of use as a right-of-way easement.  Joseph also granted land to both Andrew and Anthony and made the deed subject to a non-exclusive right to the same easement.  After Joseph died in 2016, Andrew inherited additional property accessible by the easement.  Andrew and Anthony testified that they did not have keys to the gate placed by David to access their land, and, at one point, David put a car across the right of way to block their access.  Unlike the easement holder in *Hobgood*, here, David and Cindy's gating the road significantly altered the use of the express right-of-way easement on the land Andrew and Anthony owned.  Further, David's placement of the gate additionally burdened Andrew and Anthony's land because they could not access it.  *See id.* at 843 (¶26).  Thus, the chancellor's finding that the gate was a "minimal inconvenience" was manifest error.

¶24.    David and Cindy argue that because Joseph, the original grantor of the easement, had placed a gate where the easement met Highway 43, they, too, have the right to have a gate across open areas of the easement.[3]  The express language of the easement was for the

_____

[3]  David and Cindy argue they have an "implied right to maintain" the gate because the original grantor (Joseph) installed the gate before granting the express easement; however, because we conclude David and Cindy's easement does not include the right to install a gate, their claim to a right to maintain it fails.

11

purpose of accessing their property. The easement reads as follows:

> Grantor conveys unto Grantees and reserves unto itself a nonexclusive perpetual right-of-way or easement on, over and across the following described property [(not included in memorandum)].

The language of the easement is not ambiguous. Thus, it must be enforced as it is written. *Wells*, 102 So. 3d at 1257 (¶23). Furthermore, Joseph's act of clarification signed and dated on January 24, 2015, provided evidence that his intent was for all the children to whom he had deeded property to have use of the easement to access their property. The document did not grant anything else except a right-of-way easement to enter and exit. The express language of the easement says nothing as to security or peace of mind. However, security and peace of mind was the reasoning David and Cindy testified to when trying to justify their actions of placing a gate across an easement on the land owned by Andrew and Anthony. The chancellor erred in not considering the express language of the easement by allowing David and Cindy—owners of the dominant estate—to alter and restrict the use of Andrew and Anthony's land—the servient estate—by placing a gate across the right of way. The clear language of the easement was for right-of-way access, not security or peace of mind. David unduly burdened Andrew and Anthony's land by placing a gate or other obstruction across the easement that restricted their rights to access their own property.

## CONCLUSION

¶25. The chancellor committed reversible error by granting David and Cindy the right to erect a gate across the land subject to their express easement due to their concerns for privacy and safety. We therefore reverse and remand, requiring the entry of an order granting

Andrew's request for a prohibitive injunction in accordance with this opinion. Additionally, we remand for further proceedings regarding sanctions, if any.

¶26. **REVERSED AND REMANDED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**