# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2010-CA-01226-SCT

*JAMES EDWARD CARAMBAT*

*v.*

*STACY RUTH CARAMBAT*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/23/2010 |
| TRIAL JUDGE: | HON. SANFORD R. STECKLER |
| COURT FROM WHICH APPEALED: | HANCOCK COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | STEPHEN J. MAGGIO |
| ATTORNEY FOR APPELLEE: | OTTIS B. CROCKER, III |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 10/20/2011 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**KING, JUSTICE, FOR THE COURT:**

¶1.     The Hancock County Chancery Court granted Stacy Ruth Carambat a divorce from James Edward Carambat on the ground of habitual and excessive drug use. Aggrieved, James appeals, arguing that the chancellor erred by granting the divorce, because his marijuana use did not affect the marriage, was not excessive, and was not akin to using opium, morphine, or other, like drugs. We find no error and affirm the chancery court's judgment.

## FACTS AND PROCEDURAL HISTORY

¶2.     James and Stacy married on March 20, 1993, in Metairie, Louisiana. They eventually moved to Mississippi, where they resided throughout the marriage, finally settling in Diamondhead, Mississippi, in 2004. The couple had twin boys – James Eugene Carambat and Tyler William Carambat – who were born on January 9, 1999. James and Stacy separated in August 2008, and Stacy filed for divorce on September 17, 2008.

¶3.     Stacy alleged three grounds for divorce: irreconcilable differences, habitual cruel and inhuman treatment, and habitual and excessive drug use. She requested custody of the twins, child support, equitable distribution of the assets, alimony, and attorney's fees. James answered Stacy's complaint for divorce on July 20, 2009. In his answer, James denied Stacy's grounds for divorce, her claim that they had not cohabited since the separation, and her claim that she should have custody of the twins.

### A. James's Drug Use

¶4.     During the trial, Stacy, James, and Barbara Ruth (Stacy's mother) testified about the couple's marriage. Before the couple married, Stacy knew that James regularly smoked marijuana, and James admitted that he had been smoking marijuana since he was fourteen years old. James continued smoking marijuana throughout the marriage.

¶5.     Although the couple had conversations about James's need to cease his marijuana use, James stated Stacy never asked him to quit. Stacy thought James would stop his drug use once the twins were born. According to Barbara, James called her after the twins were born, acknowledged his drug use as a problem, and told her he intended to quit. Because of James's marijuana use, Stacy was afraid that he would get into legal trouble, especially since he often picked her up from work with marijuana in the car. Several times during the

2

marriage, James managed to go weeks without using marijuana. He said the longest period of time was one month. But he would always start using again.

¶6. Stacy testified that James had used other drugs. He once smoked cocaine at the beginning of their marriage, and he used Xanax, which was not prescribed to him, to cope with sleep deprivation. James stated that the cocaine incident had happened one time in 1995 or 1996. He said he took Xanax for two years, but that was several years ago. James testified that he had not used marijuana since January 2009, and he was willing to take a drug test.

¶7. James was questioned about the frequency of his marijuana use. James testified that he would purchase one quarter-ounce bag of marijuana per month, which cost between thirty-five and fifty dollars. James could make six to seven cigarettes with this amount. Stacy said James smoked marijuana multiple times a day, starting in the morning before work. Both parties stated that the children were never exposed to James's drug use because James smoked the marijuana in the garage.

### B. James's Interaction with the Family

¶8. According to Stacy, James's drug use affected his interactions with the family, causing him to develop a routine:

> [H]e would leave for work and smoke, and then go to work [sic] and then come home, and he would get undressed, go out to the garage and smoke again, and then he would come home, sit on the couch and wait for dinner to be fixed. And then eat dinner and then return back to the couch or to the computer room. He almost isolated himself from us totally.

Stacy often went to bed alone, and James would stay awake to use the computer or to watch television. Stacy stated that this took a toll on their marriage. Stacy also testified that, after

3

the twins were born, she withdrew from James on an intimate level. James agreed and stated that Stacy's disinterest caused him to withdraw as well.

¶9. Stacy also testified that it was a chore to get James to participate in family activities. Most times, James would stay home instead of coming to family functions. Barbara echoed Stacy's sentiments, stating that James had become disinterested in attending family functions three years ago.

¶10. James said that his marijuana use was casual, and that he was not dependent on it. According to James, marijuana had a calming effect on him. He explained that marijuana did not keep him from family functions; he just did not care to be around Stacy's family. James also stated that he was actively involved with the twins and their extracurricular activities – fishing, "bb" guns, and sports. James said he also helped the twins with their homework. Stacy agreed, but she said that James had come to only a few of the twins' school activities – such as parent-teacher conferences.

## C. Financial Trouble

¶11. Stacy testified that James's marijuana use affected his work productivity. While employed with a printing company in Biloxi, Mississippi, James botched a printing job that cost several thousand dollars to reprint.[1] He was demoted as a result.[2] The demotion caused James to lose his bonus pay. According to Stacy, James told her that his drug use probably played a part in the incident. Stacy said that, afterwards, James tried to stop smoking

---

[1]The record does not state specifically what year the printing blunder occurred. However, the record reveals that the incident occurred some time after the family moved to Diamondhead in 2004.

[2]A year later, James was reinstated to his position.

4

marijuana. On cross examination, James's trial counsel impeached Stacy with her deposition testimony. In her deposition, Stacy was asked whether James's work incident was a mistake or a result of his drug use. Stacy responded that it was a mistake. She also agreed with trial counsel's statement that no one at James's job had linked the error to his marijuana use.

¶12. James denied telling Stacy that marijuana had caused his work error. He said he did not smoke marijuana before work, and his marijuana use never affected his job performance. James said the printing industry was stressful, and he smoked marijuana after work to relax. James also stated that he had never been fired from a job, but he had been laid off by at least two previous employers.

¶13. Stacy testified that James's drug use and mistake on the job affected the family's financial stability. James blamed their financial issues on Stacy's credit-card use. Stacy said they had borrowed $3,000 to $5,000 from her parents because they could not pay their bills, and James had continued to purchase marijuana during their financial troubles. Barbara testified that she and her husband had loaned Stacy and James up to $7,000. In addition, James said that he had borrowed at least $25,000 from his brother after he was laid off. James said he had used the money to pay for a dental surgery, credit-card debt, and the family's living expenses after Hurricane Katrina.

### D. James's Behavior

¶14. Barbara said Stacy always appeared nervous around James and cautioned others to censor themselves around him. Stacy stated James would make derogatory comments – sometimes in her family's presence – about her clothing, income potential, and propensity to flirt with other men. Barbara had witnessed one such argument four to five years

5

previously at a wedding. According to Barbara, James had yelled at Stacy about her clothing in front of other guests and eventually had stormed out of the wedding. James denied that the argument was about Stacy's clothing. Barbara also said James had argued with Stacy about other men at a family gathering three years before.

¶15. Stacy said James cursed at her after she had filed for divorce, and their arguments had increased from weekly to daily. She stated James called her derogatory names in front of the children. They also had a big argument in front of the children, after which she and the twins retreated to the bedroom to avoid confrontation. James stated that he and Stacy did not have any more problems than any other married couple. He stated that they often argued about finances, mainly outside the children's presence. He denied ever physically abusing Stacy, and Stacy testified that James never physically abused her.

### E. Stacy's Affair

¶16. After moving to Diamondhead, James said Stacy met new friends at the country club and had begun to socialize with them often. Stacy expressed that she needed time away from the children. At first, James did not think her request was strange. But the frequency of Stacy's excursions increased in 2008. Stacy also had lost weight, began dressing differently, and purchased lingerie. James found Stacy's lingerie and questioned her about it. She told him that she had bought it for herself. These events caused James to suspect Stacy of cheating.

¶17. According to James, in 2008, he and Stacy attended a party at the home of Royce Wilkinson, one of Stacy's male friends.[3] James felt uncomfortable at the party because other

---

[3]James and Stacy disagree as to the month the events occurred in 2008.

men were flirting with Stacy. James stated that, later that year, he had called Stacy and questioned her about her whereabouts. Stacy had informed James that she was at Wilkinson's home taking care of his dog, and she and the twins had taken a ride in Wilkinson's golf cart. James said he was upset because, if anyone had seen his wife and children in Wilkinson's golf cart, they might have gotten the wrong idea. An argument ensued, during which Stacy told James that she was no longer happy and wanted a divorce.

¶18. When Stacy filed for divorce, James thought that they could work it out. According to James, Stacy complained only that they were no longer a family and that he was not helping out at home. James said Stacy never mentioned his marijuana use, and Stacy testified that she did not give James an ultimatum concerning his marijuana use. James had suggested that they seek counseling, but he stated that Stacy was not interested. They did seek counseling individually but not as a couple. James did not believe that his marijuana use contributed to the demise of the marriage. Instead, he believed that their arguments caused the separation.

¶19. At the time of trial, Stacy was dating a man named Tom Henry. Stacy met Henry in October 2007, but she claimed that their relationship did not develop until April 2008. Stacy testified that she had been disenchanted with James well before her relationship with Henry, and that she had contemplated divorcing James at least one to two years earlier. Since filing for divorce in September 2008, Stacy said that she and Henry had developed a sexual relationship and were in love. During her relationship with Henry, Stacy and James remained in the same household until April 2009.

**F. The Chancellor's Ruling**

7

¶20. Although this was a chancery court matter, James moved for a directed verdict.[4] First, he argued that Stacy had failed to provide evidence of habitual cruel and inhuman treatment. Stacy agreed. Thus, this ground for divorce was dismissed. Next, James argued that Stacy had failed to provide evidence of habitual and excessive use of opium, morphine, or other like drugs. The chancellor found that the evidence regarding James's habitual and excessive drug use was more favorable to Stacy. James raised condonation as a defense, and Stacy objected, arguing that James had failed to plead condonation as an affirmative defense. James also argued that Stacy's adultery had caused the divorce. The chancellor stated that he could not grant a divorce to both parties and reminded James that he had failed to request a divorce on the ground of adultery. Accordingly, the chancellor denied James's motion.[5]

¶21. The chancellor entered the "Judgment of Divorce" on September 24, 2009. The chancellor found James's own admission that he had regularly smoked marijuana from fourteen years of age to fifty-five years of age was evidence that his use was habitual and frequent. The chancellor found that James's drug use was excessive and uncontrollable because James smoked daily, he could not quit, and his drug use affected his work

---

[4]James styled his motion as one for a directed verdict. But pursuant to Mississippi Rule of Civil Procedure 41(b), a motion to dismiss is the proper procedural mechanism. Rule 41(b) provides that:

> [a]fter the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief.

[5]At this time, James made an oral request for an interlocutory appeal, and the chancellor orally granted his request. The chancellor did not enter a formal order granting James's request, and James did not file a petition for interlocutory appeal with this Court.

8

productivity and finances. Last, the chancellor found James's marijuana use met the definition of "other like drug" and caused his marriage to be repugnant to his spouse. Although not the same chemical make-up as opium and morphine, the chancellor determined that marijuana had the same effect, impairing James's ability to perform his job and to support his family.

¶22. For those reasons, the chancellor granted Stacy's divorce on the ground of habitual and excessive use of drugs. The chancellor awarded Stacy custody of the twins, the marital home, and attorney's fees.[6] The chancellor granted James visitation and ordered him to pay child support and obtain medical insurance for the twins.

¶23. James filed several post-trial motions regarding his visitation and child-support obligation. The chancellor denied James's requested relief. On April 7, 2010, James filed a motion to reopen the time for appeal. The chancellor granted James's request on July 20, 2010. On July 26, 2010, James timely filed his notice of appeal.

## ANALYSIS

¶24. In a divorce proceeding, the chancellor is the finder of fact, and the assessment of witness credibility lies within his sole province. *Sproles v. Sproles*, 782 So. 2d 742, 746 (¶12) (Miss. 2001). Thus, we will not disturb a chancellor's findings when supported by substantial evidence unless the chancellor's judgment was manifestly wrong, clearly erroneous or an erroneous legal standard was applied. *Id.* at 746 (¶¶12-13).

**Whether the chancellor erred by granting Stacy a divorce on the ground of habitual and excessive use of opium, morphine, or other like drug.**

---

[6]The chancellor did not award Stacy alimony.

9

¶25. James argues that the chancellor erred by granting Stacy a divorce because she did not prove that his drug use was excessive and an "other like drug" as required by the statute. James also maintains that Stacy condoned his marijuana use and that his marijuana use did not cause any family, marital, or work issues. Instead, James blames the marriage's demise on Stacy's extramarital affairs.

¶26. Conversely, Stacy asks the Court to affirm the chancellor's judgment. She argues that there is substantial evidence to support the chancellor's finding that James's drug use was habitual, excessive, and harmful to the family. Stacy also contends that the effect of marijuana is much like the effect of opium and morphine; thus, it is an "other like drug" for purposes of the statute. Because James did not specifically plead condonation as a defense, Stacy argues that it is waived. Stacy also maintains that James waived his recrimination argument because he failed specifically to plead it. Alternatively, Stacy argues that the chancellor may still grant a divorce even when both parties are at fault.

### I. Condonation

¶27. First, we address James's claim that Stacy was not entitled to a divorce because she had condoned his drug use. According to Stacy, she dated James two years before marrying him, and she knew about his drug use all along. But affirmative defenses, such as condonation, must be specifically pleaded or else they are waived. M.R.C.P. 8(c); *Ashburn v. Ashburn*, 970 So. 2d 204, 212 (¶23) (Miss. Ct. App. 2007) (citing *Goode v. Village of Woodgreen Homeowners*, 662 So. 2d 1064, 1077 (Miss. 1995)). Based upon our review of the record, James failed to plead condonation, and Stacy objected to his raising the defense at trial. Thus, we find that this argument has been waived.

10

**II. Recrimination**

¶28. Next, James argues, under the doctrine of recrimination, that Stacy's adultery actually led to the demise of the marriage. But James did not file a cross-claim for divorce, and he did not plead recrimination. Even if James had pleaded the doctrine of recrimination, it would not have precluded Stacy from being granted a divorce.[7] *See* Miss. Code Ann. § 93-5-3 (Rev. 2004). Thus, we find that this argument is barred from review.

**III. Habitual and Excessive Use of Opium, Morphine, or Other Like Drug**

¶29. Mississippi Code Section 93-5-1 (Rev. 2004) lists "habitual and excessive use of opium, morphine, or other like drug" as a ground for divorce. A grant of divorce on this ground requires the plaintiff to establish that the spouse's drug use was (1) habitual and frequent, (2) excessive and uncontrollable, and (3) that involved opium, morphine, or drugs with a similar effect as opium or morphine. *Ladner v. Ladner*, 436 So. 2d 1366, 1375 (Miss. 1983).

**A. Habitual & Frequent Use**

¶30. Habitual use is established by showing that the spouse customarily and frequently used drugs. *Ladner*, 436 So. 2d at 1373. Stacy presented evidence that James began smoking marijuana at the age of fourteen, and his use continued until the age of fifty-five. James concedes that his drug use was habitual and frequent, testifying that he had used

---

[7] Section 93-5-3 provides that "[i]f a complainant or cross-complainant in a divorce action shall prove grounds entitling him to a divorce, it shall not be mandatory on any chancellor to deny such party a divorce, even though the evidence might establish recrimination on the part of such complainant or cross-complainant."

marijuana almost daily. As a result, we find substantial evidence in the record to support the chancellor's finding that James's drug use was habitual and frequent.

### B. Excessive & Uncontrollable Use

¶31. Excessive drug use requires a showing that the offending spouse abused drugs. *Ladner*, 436 So. 2d at 1373-1374. The offending spouse "must be so addicted to the use of drugs that he cannot control his appetite for drugs whenever the opportunity to obtain drugs is present." *Id.*

¶32. James argues that his drug use was casual, it relaxed him, and he was not dependent on it. The evidence shows the contrary. Stacy and James testified that James had attempted to stop smoking marijuana several times, quitting for weeks at a time. But, as James stated himself, he always went back to it.

¶33. James argues that his drug use was not as serious as that of the spouses in *Ladner* and *Ashburn*. In *Ladner*, the spouse deceitfully obtained numerous prescription drugs from multiple doctors. *Ladner,* 436 So. 2d at 1369. He abused the prescription drugs continuously for four years and exceeded the prescribed dosages. *Id.* The spouse's drug use negatively affected his attitude, actions, work habits, and family and social relationships. *Id.* The wife testified that her husband was hyperactive in the morning – having taken Ritalin – and practically immobile in the evening – after taking tranquilizers. *Id.* He worked only two days per week and spent the rest of the time in idleness and agitation. *Id*. He also ceased communicating with friends. *Id*. Because of his drug habit, the spouse had squandered his son's savings account, and had taken many valuable items from the home. *Id.*

12

¶34. Likewise, in *Ashburn*, the spouse's drug use was excessive and uncontrollable. In this case, the wife abused prescription drugs throughout the marriage, also deceitfully obtaining prescriptions and exceeding the prescribed dosages. *Ashburn*, 970 So. 2d at 207 (¶7). She once left home and did not return for weeks. *Id.* The husband testified that his wife would be yelling one day and drooling in a drug-induced state the next. *Id.* at 208 (¶8). She forged his name on checks and also stole someone else's written prescription. *Id.* at 208 (¶¶8-9). The wife's drug use increased to the point where she used a three-month supply of pills in one month and overdosed. *Id.* at 208 (¶7).

¶35. The extent of James's addiction may not be as drastic as that of the spouses in *Ladner* and *Ashburn*, but it is obvious that James had a problem. Quitting for weeks at a time but then always going back to achieve a high is the nature of addiction. Like the spouse in *Ladner*, James abused the drug almost daily for years – approximately forty years in James's case. This is evidence that, at the time, James could not control his appetite for marijuana. Also, the chancellor found that James's marijuana use negatively impacted his interaction with his family, work productivity, and the family's financial stability. There is substantial evidence in the record to support the chancellor's findings. Thus, we hold that the chancellor did not err by finding that James's drug use was excessive and uncontrollable.

### C. Opium, Morphine, or Other Like Drug

¶36. Next, James argues that Stacy failed to prove that marijuana is an "other like drug" similar to opium or morphine. In Section 93-5-1, the language "other like drug" does not mean a drug similar in chemical makeup to opium or morphine. *Ladner,* 436 So. 2d at 1374.

Instead, it refers to drugs with similar adverse effects.[8] *Id.* at 1374-1375 (finding that spouse's abuse of prescription drugs produced similar effects as abuse of opium or morphine). In *Ladner*, the Court set forth factors to consider, along with other relevant circumstances, to determine whether a drug is an "other like drug" for purposes of Section 93-5-1:

> [S]uch factors as the guilty spouse's inability to support his wife and family or to properly attend to business should be considered. Additionally, the guilty spouse's incapacity to perform other marital duties or his causing the marital relationship to be repugnant to the innocent spouse are equally important.

*Id.* at 1375.

¶37. In this case, the chancellor determined that James's marijuana use had isolated him from the family and had caused him to botch a costly printing job. Consequently, James was demoted, and the chancellor determined that this had negatively impacted the family's finances.

¶38. James points out that neither party cited a decision in which a divorce was granted based on marijuana use alone. We are not convinced that the absence of such a decision has any bearing on this case.

¶39. James argues that no credible evidence supported the chancellor's finding that his marijuana use interfered with his ability to support and interact with his family and that his marijuana use caused the marital relationship to be repugnant to Stacy. Instead, James maintains that the evidence shows that Stacy sexually withdrew from him, pursued her own

---

[8] In *Ladner*, the spouse abused barbiturates, amphetamines, Dalmane, Libriam, Ativan, Nolundar, Mellaril, Sinequan, Vivactil, Talwin, and Tylenol No. 3 with Codeine.

14

activities, and engaged in extramarital affairs. But the chancellor is the finder of fact, and the assessment of witness credibility lies within his sole province. *Sproles*, 782 So. 2d at 746 (¶12). The chancellor resolved any conflicts in the evidence in favor of Stacy, and the evidence supports his decision.

¶40. The evidence shows that the family's financial problems were due mainly to James's layoffs. But by smoking marijuana, James, at least once, affected his work productivity and lost his bonus pay. In addition, he continued to purchase marijuana during the family's economic troubles. James maintains that his marijuana expenditures were minimal and did not affect the family's income. But he cannot escape the fact that spending money on illegal drugs is wasteful, especially when the family is suffering financially.[9] According to Stacy, James's drug use created a routine in their marriage by which he would work, come home, use drugs and then sit on the couch or stay on the computer all night. Perhaps he did not isolate himself from his children, but he definitely isolated himself from Stacy. Stacy was worried that James would get arrested for possession of marijuana. And although Stacy did not give James an ultimatum, she was exasperated over his failed attempts to remain clean, causing her to file for divorce.

¶41. The evidence supports the chancellor's finding that James's marijuana use had a like effect to the use of opium or morphine. James evidenced an inability to support his family and to properly attend to business. This made the marriage repugnant to Stacy. Accordingly, we hold that the chancellor did not err by finding that James's drug use involved opium, morphine, or a drug with a similar effect.

---

[9] During the trial, James admitted that buying illegal drugs is wasteful.

15

## CONCLUSION

¶42. Stacy was entitled to a divorce based on James's habitual and excessive use of marijuana. James conceded that his drug use was habitual and frequent. Evidence that James continuously used marijuana for approximately forty years and continuously failed at sobriety supports the chancellor's finding that James's drug use was excessive and uncontrollable. Furthermore, evidence that James's marijuana use caused him to isolate himself from the family and affected his work productivity, which impacted the family's finances, supports the chancellor's finding that James's marijuana use was similar in effect to opium or morphine. As a result, we affirm the chancellor's judgment of divorce.

¶43. **AFFIRMED.**

**WALLER, C.J., RANDOLPH, LAMAR, CHANDLER AND PIERCE, JJ., CONCUR. CARLSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J., AND KITCHENS, J.**

**CARLSON, PRESIDING JUSTICE, DISSENTING:**

¶44. The Hancock Country Chancery Court granted Stacy Carambat's divorce from her husband, James Carambat, on the ground that he was a habitual and excessive user of opium, morphine, or other like drug,[10] where the drug in question was marihuana. This Court has never found this ground for divorce to be satisfied by marihuana use alone; nor, indeed, has any appellate court in the United States. It is my opinion that granting the divorce on this basis will dramatically expand this ground for divorce far beyond the language of the statute, effectively legitimizing divorce based on the use of any illegal drug. Because I believe that

---

[10]Miss. Code Ann. § 93-5-1 (Rev. 2004).

16

the majority's opinion goes far beyond the intent of the Legislature and creates new law, I must respectfully, but fervently, dissent.

### I. Nature of the Appeal

¶45.   James argues that marihuana is not a like drug to opium or morphine.  There is no relevant caselaw from Mississippi granting a divorce on this ground for the abuse of marihuana alone.  Indeed, both parties, as well as the judge, conducted searches for persuasive precedent from all U.S. jurisdictions.  Their research, and my own, indicate that no appellate court in the United States has ever granted a divorce based on marihuana use alone, or indeed has ever faced this question.[11]  This is a novel issue, and one that the chancery court specifically intended for us to consider.  Accordingly, I respectfully believe we must thoroughly address this issue.

¶46.   The chancery court in the initial case adjudicated that marihuana was a like drug to opium and morphine, but granted James leave to petition us for an interlocutory appeal.  The chancellor explained that the relevant substances were alike in that they were habit-forming, mood-altering or hallucinogenic, and illegal.  However, the chancellor did not enter a formal order granting James's request for appeal, and James did not file a petition for interlocutory appeal with this Court, due to what he later claimed was a misunderstanding.  The chancellor rendered final judgment.  On motion for rehearing or to amend judgment, the chancellor

---

[11]However, marihuana use has played a part in analysis of an alternate divorce ground, "habitual cruel and inhuman treatment."*See, e.g.*, **Boutwell v. Boutwell**, 829 So. 2d 1216, 1220 (Miss. 2002).

17

offered James another opportunity for an interlocutory appeal, and Stacy's counsel indicated that they were amenable to this procedure.

¶47. James's counsel considered taking the proffered interlocutory appeal option in discussions in open court, but decided that "an interlocutory appeal may result in multiple trips to the Supreme Court when one only may really be necessary on the issue that we want to get before them . . . we would withdraw our request for an interlocutory appeal." Final judgment and this direct appeal followed, but the urgency of fully addressing the issue remains. As the chancellor stated, "the fact is, it's one of those things that needs to be clarified in the Mississippi Supreme Court."

## II. Standard of Review

¶48. "We review a chancellor's legal conclusions de novo; that is, we reach our own conclusions as to the applicable law." *Bluewater Logistics, LLC v. Williford*, 55 So. 3d 148, 155 (Miss. 2011). "But we ordinarily accept a chancellor's factual findings unless – given the evidence in the record – we conclude that the chancellor abused his or her discretion, and no reasonable chancellor could have come to the same factual conclusions." *Bluewater Logistics, LLC*, 55 So. 3d at 155. Thus, we will not disturb a chancellor's findings of fact when supported by substantial evidence, unless the chancellor abused his or her discretion, was manifestly wrong, was clearly erroneous, or applied an erroneous legal standard. *Limbert v. Miss. Univ. For Women Alumnae Ass'n, Inc.,* 998 So. 2d 993, 998 (Miss. 2008) (quoting *Hamilton v. Hopkins*, 834 So. 2d 685, 699 (Miss. 2003)). In a divorce proceeding, the chancellor is the finder of fact, and the assessment of witness credibility lies within the chancellor's sole province. *Sproles v. Sproles*, 782 So. 742, 746 (Miss. 2001).

18

### III. Illegality

¶49. Before addressing our standard as to what drugs are like opium and morphine, I must address an alternate standard, illegality, that, in my opinion, the chancellor mistakenly invoked. On motion for rehearing to amend the judgment, Stacy's counsel argued that "the question about whether or not marijuana falls within the statute . . . can best be explained by looking at the fact that the mere possession of marijuana is illegal in this state." The chancellor stated that "the fact that the children are exposed to the dad getting away with this illegal act, in my judgment, contributes to the delinquency of minors . . . . Mr. Carambat is setting an example for his children, and this Court has to find some way of overcoming that."

¶50. Respectfully, I believe the chancellor homed in on the wrong grounds for considering whether marihuana is a like drug to opium and morphine. The "opium, morphine, or other like drug" ground for divorce entered the Mississippi Code in 1892. Deborah H. Bell, *Mississippi Family Law* § 4.02[7] (2005), Miss. Code Ann. § 1562 (1892). At that time, neither possession, distribution, nor use of opium and morphine was illegal in the State of Mississippi. Indeed, in perusing the 1892 code, only two crimes related to that drug can be found. It was a misdemeanor to sell morphine in a container without a scarlet label with white letters, and it was similarly a misdemeanor to sell morphine to any customer who did not have a physician's certificate. Miss. Code Ann. §§ 1213, 1214 (1892). Violation of either statute by the druggist was punishable by a fine of between ten dollars and fifty dollars.

¶51. Even if this Court analyzes the status of opiates and marihuana today, the two substances are not legally alike. Marihuana possession is still regulated in Mississippi, but

19

in a special section involving lighter penalties than those prescribed for all other scheduled substances. Possession of thirty grams or less of marihuana is penalized, for a first offender, with a fine of between $100 and $250. Miss. Code Ann. § 41-29-139(c)(2)(A) (Rev. 2004). James bought approximately one quarter ounce of marihuana a month -- just over seven grams. The offense is not considered a misdemeanor and entails no jail time. In comparison, possession of even less than one tenth of a gram of any controlled substance classified in Schedule I or II, except marihuana, may be charged as either a misdemeanor or a felony, and may entail a fine of up to $10,000 and prison time of up to four years. Miss. Code Ann. § 41-29-139(c)(1)(A) (Rev. 2004).

¶52. Regardless of the legal status of marihuana, granting a divorce based on illegal conduct is not in the spirit of the common law. An instructive analogy can be made to the legal problem that was resolved by modern slayer's statutes, like that Mississippi has enacted. Miss. Code Ann. § 91-1-25 (Rev. 2004). At common law, many courts held that one who murdered a decedent was still eligible to inherit property from him.[12] *See* e.g., ***In re Duncan's Estates,*** 40 Wash. 2d 850, 854, 246 P.2d 445, 447-48 (1952). The law held that the remedy for murder was criminal prosecution, not disinheritance. Similarly, the possession and use of marihuana is certainly criminalized in Mississippi. Whether such use may be grounds for a divorce is another question entirely.

### IV. Precedent

---

[12]Other courts disagreed, holding that one should not profit from an injustice.

¶53. This Court must consider whether marihuana is a like drug to opium and morphine. In construing the statute, it must be given its ordinary meaning. Mississippi Code Section 1-3-65 (Rev. 2005) provides that "all words and phrases contained in the statutes are used according to their common and ordinary acceptation and meaning. . . ."

¶54. In *Lawson v. Lawson*, 821 So. 2d 142, 145 (Miss. Ct. App. 2002) the Court of Appeals held that, in determining whether a drug is an "other like drug" under Section 93-5-1, "[so] far as the kind of drug is concerned, *chemical content is not important, but effect caused by use is the test*." *Id.* at 145 (quoting *Ladner v. Ladner*, 436 So. 2d 1366, 1375 (Miss. 1983)) (emphasis in original). In *Ladner*, this Court set forth factors to consider: "[S]uch factors as the guilty spouse's inability to support his wife and family or to properly attend to business should be considered. Additionally, the guilty spouse's incapacity to perform other marital duties or his causing the marital relationship to be repugnant to the innocent spouse are equally important." *Id.* at 1375.

¶55. Two prior cases are relevant to this analysis. In *Ladner*, the spouse deceitfully obtained numerous prescription drugs and abused them for four years, exceeding the prescribed dosage. The spouse's drug use negatively affected his attitude, actions, work habits, and family and social relationships. The wife testified that her husband was hyperactive in the morning (after taking Ritalin) and practically immobile in the evening (after taking tranquilizers). He worked only two days per week, ceased communicating with friends, squandered his son's savings account, and took many valuable items from the home. *Ladner*, 436 So. 2d at 1369.

21

¶56. In another Court of Appeals case, the wife abused prescription drugs throughout the marriage. ***Ashburn v. Ashburn***, 970 So. 2d 204, 207 (Miss. Ct. App. 2004). She once left home and did not return for six weeks. *Id.* at 207. She forged her husband's name on checks and stole someone else's prescription. *Id.* at 208. The wife's drug use increased to the point that she started obtaining three month's worth of pills in one month through her husband's insurance coverage, and in one instance, two witnesses observed her overdosing on pills. *Id.*

### V. Effect of the Drug

#### A. Physical Effect

¶57. I first wish to address the effect of marihuana usage, which, this Court has held to be the key determinant in finding that a drug is sufficient for this ground for divorce. *See Lawson*, 821 So. 2d 145, ***Ladner***, 436 So. 2d 1375. While the chemical content of the like drug is irrelevant, I would hold that the physical or physiological effect of the drug was meant to be considered in the ***Ladner*** effect test.

¶58. In ***Ladner***, this Court found "a physical effect [on the husband] similar to morphine or opium." ***Ladner***, 436 So. 2d at 1375. Furthermore, if "effect" and thus "like drug" mean no more than work productivity, marital duties, and repugnancy of the marriage, the term would become synonymous with the "excessive" standard already incorporated into the test. As a result, I have analyzed the physical effects of marihuana and find it to be unlike opium and morphine as a matter of law.

¶59.   For information on the effects of marihuana, and of the most commonly utilized opiates, I consulted the Research Report Series of the National Institutes of Health's National Institute on Drug Abuse.[13]

¶60.   Marihuana, per this resource, is ingested to cause the user to feel a euphoria or "high" by stimulating brain cells to release the chemical dopamine -- a phenomenon also associated with most drugs of abuse, as well as alcohol, tobacco, chocolate, and sexual activity.  Acute dangers associated with marihuana intoxication include short-term memory loss, impaired attention and judgment, increased heart rate and blood pressure, decreased coordination and balance, and occasionally feelings of anxiety, distrust, or panic.  Cumulative use may lead to addiction, though it is considered less addictive than "hard" drugs.

¶61.   The following information is also gleaned from the Research Report Series of the National Institutes of Health's National Institute on Drug Abuse.  The most commonly used opiate in the United States today is heroin.  Heroin is severely addictive, and withdrawal can cause painful physical symptoms, including vomiting and bone pain.  Since users are typically unaware of the amount and purity of the drug they are using, the drug can lead to nearly instantaneous death upon use.  In the brain, the heroin converts to morphine and binds rapidly to opioid receptors, triggering a surge of pleasurable sensation called a "rush."  Several drug analogs to opium have been produced, some by pharmaceutical companies for medical reasons, but others, known as "designer drugs," by illegal laboratories.  This latter category may be more dangerous than the original compound.  Several of the most abused

---

[13]National Institute on Drug Abuse, Research Report Index http://www.nida.nih.gov/researchreports/researchindex.html, (last accessed Oct. 18, 2011).

prescription drugs are also opioids, commonly prescribed because of their pain-relieving properties. These opioids, such as OxyContin, also produce euphoria as a side effect. Withdrawal leads to the same physical symptoms caused by heroin withdrawal, and a large enough dose of these drugs may lead to death. *Id.*

¶62. The effect of marihuana is unlike the effect of opiates. The only real similarities between the drugs appear to be the euphoric rush or high associated with their use, and the addiction. Neither of these features is alike in degree. Marihuana, according to the Research Report Series of the National Institutes of Health's National Institute on Drug Abuse, never leads to immediate death, lacks physical withdrawal symptoms, and is much less addictive than opium. While this resource indicates that marihuana clearly leads to decreased activity in the abuser, holding that marihuana is like an opiate on these grounds is analogous to holding that caffeine is like cocaine.

¶63. Our state's caselaw on this issue, scant though it is, has been dominated by the abuse of prescription drugs including opiates, and without exception, a divorce has been granted only when individuals were much more severely incapacitated than James was in this case. *See Ladner*, 436 So. 2d at 1375 (spouse abused prescription drugs including barbiturates, amphetamines, Dalmane, Librium, Ativan, Nolundar, Mellaril, Sinequan, Vivactil, Talwin, and Tylenol No. 3 with Codeine, which constituted opium, morphine, or other like drug); *Smithson v. Smithson*, 113 Miss. 146, 74 So. 149, 150 (1917), modified on suggestion of error, 113 Miss. 644, 74 So. 609 (1917) (unspecified "drugs to palliate her physical pains to such an extent and period of time that she became an habitual and excessive user of these insidious drugs. . . ." constituted opium, morphine, or other like drug); *Ashburn v. Ashburn*,

24

970 So. 2d at 209-10 (Miss. Ct. App. 2007) (morphine prescribed by a physician, abuse of prescription drugs including Lortab, Effexor, Lithium, Neurontin, Klonopin, and OxyContin, as well as abuse of hydrocodone and marihuana, together constituted opium, morphine, or other like drug); and *Lawson*, 821 So. 2d at 145 (abuse of the prescription drugs Darvocet-N, Lortab, hydrocodone, and Tylenol No. 3 with Codeine constituted opium, morphine, or other like drug).

¶64.	With this caselaw in mind, in today's case, James was able to function on a relatively normal level while abusing marihuana, hardly a behavior associated with abusers of drugs as depicted in the cases cited in the preceding paragraph.

¶65.	In addition, given the unfortunate prevalence of marihuana in American society, it is a dangerous precedent to allow divorce for marihuana use alone. As already revealed, marihuana is considered to be a relatively mild drug, and remains the least regulated of all illegal drugs in the State of Mississippi. Marihuana is less addictive, less immediately dangerous, and less incapacitating than the major opiates, and indeed than most other illegal drugs. Allowing a divorce based on marihuana abuse will effectively hold that divorce is available for the abuse of any drug -- which is not a natural reading of "opium, morphine or other like drug."

¶66.	To be sure, marihuana abuse, like alcohol abuse, has the propensity to destroy a marriage. However, the Legislature has not seen fit to provide for divorce on such grounds, and it is not this Court's responsibility to create new grounds for divorce *ex nihilo*. In my opinion, the natural meaning of "opium, morphine or other like drug" is not so broad as to cover marihuana. Accordingly, I would find that the chancery court erred in granting a

divorce on the ground of using "opium, marihuana or other like drug," where the sole drug habitually and excessively used was marihuana.

## B. The *Ladner* Factors

¶67.    Although I would hold that marihuana, as a matter of law, is too unlike opium or morphine to satisfy the definition of a "like drug" to opium and morphine, I have considered its effects in the present case. Under ***Ladner***, factors this Court is to consider include "the guilty spouse's inability to support his wife and family or to properly attend to business . . . [as well as] incapacity to perform other marital duties or his causing the marital relationship to be repugnant to the innocent spouse." ***Ladner***, 436 So. 2d at 1375. The chancellor's order referenced this language and analyzed these factors, but does not specify which grounds the chancellor found to have been satisfied in finding that marihuana met the effect test as a like drug to opium and morphine. Thus, I have reviewed the evidence as to all of these factors.

¶68.    An analogy may be drawn to habitual drunkenness, the most similar ground for fault-based divorce in Mississippi law.[14] In ***Culver v. Culver***, 383 So. 2d 817, 817-18 (Miss. 1980), this Court did not find habitual drunkenness where the husband consumed four or five beers a night, without significant impact on his family or work. It must be recognized that divorce is not to be granted under these two fault-based grounds due to the mere fact that the husband abused alcohol or opiates and like drugs, but only due to the effect that these substances might have on the marriage.

---

[14]Professor Bell draws this analogy in considering these two grounds for divorce. Deborah H. Bell, *Mississippi Family Law* § 4.02[6] (2005)

¶69.   Here, even assuming *arguendo* that marihuana is not an unlike drug to opium and morphine as a matter of law, the effect of the marihuana abuse was minimal.  In my opinion, the chancellor abused his discretion in finding that James was a habitual and excessive user of opium, morphine, or other like drug, thus justifying granting a divorce to Stacy on this ground.  The evidence indicates that marihuana usage at worst marginally affected James's business life and did not substantially harm James's relationship with his children.  While James's relationship with his wife Stacy sharply declined, the evidence does not indicate that James's marihuana usage was responsible for this deterioration.

### 1.  Marital Duties and Repugnance

¶70.   As the majority recognizes, James's marihuana abuse was in no way comparable to the facts of **Ashburn** or **Ladner**.  James did use the drug almost daily for more than forty years. Stacy testified that James's routine was to come home from work, smoke marihuana, and wait for her to prepare dinner.  He would then isolate himself on the couch or in the computer room and sometimes come to bed late after staying awake to use the computer or watch television. James testified that he withdrew from his wife because she had withdrawn from him sexually after their children were born, in 1999, ten years before this divorce action was filed. Stacy admitted that she had withdrawn from James on an intimate level at that time.

¶71.   Stacy testified that James had remained involved in their children's lives, taking them to church, helping them with their homework, and participating in their social activities, particularly fishing, sporting events, and shooting "bb" guns. Stacy complained that he came to only a few school activities, such as parent-teacher conferences.  James did attend events

with his wife's family less frequently and with Stacy's mother, Barbara Ruth in particular, stating that he became disinterested in these family events about three years before these proceedings began. James testified that this was because he did not like his wife's family.

¶72. On the whole, James's relationship with his inlaws is far less significant in divorce proceedings than his relationship with his children and with his spouse. The evidence is clear that James's relationship with his children remained strong and healthy. In contrast, his relationship with Stacy clearly declined. However, this decline was due to reasons other than the marihuana abuse. James testified, and Stacy admitted, that she had withdrawn from him sexually ten years prior, when their children were born.

¶73. Stacy testified that she began dating a man named Tom Henry before filing this divorce. James suspected or became aware of Stacy's adultery, and this affected the relationship between them. James also testified, and Stacy agreed, that Stacy never specifically asked James to stop smoking marihuana, though she claimed that his continued use exasperated her. The evidence is uncontroverted that Stacy was aware of James's marihuana habit two years before they married. While James failed to timely plead the affirmative defense of condonation, this testimony can hardly be irrelevant to our analysis. Since Stacy married James with the knowledge that he was a heavy abuser of marihuana, and never asked him to quit, in my opinion, it was unreasonable to conclude that James's marihuana abuse made the marriage repugnant to her.

¶74. James did stop performing certain marital duties, though there is no evidence that this was due to incapacity to perform them. The marriage obviously did become repugnant to Stacy. However, since Stacy had withdrawn from James sexually, engaged in an adulterous

28

affair, and was aware of James's marihuana use even before marriage but never asked James to quit using it, the chancellor, in my opinion, abused his discretion by holding that marihuana abuse was responsible for this state of affairs.

## 2. Support of Family and Attending to Business

¶75.    There was minimal evidence that James's marihuana use substantially affected his earning capability.  Trial testimony showed that James worked every day of the marriage except for brief periods of time when he lost employment due to his job being discontinued or, in one case, his company going bankrupt after Hurricane Katrina.  As the majority notes, the Carambats' financial difficulties were primarily caused by these layoffs.  Stacy was able to argue only one instance in which marihuana use affected James's job performance: an instance where James was demoted for botching a printing job.  Stacy testified that James had told her that his drug use played a part in this incident.

¶76.    On cross-examination, Stacy was impeached with her deposition, in which she was questioned about the demotion.  Stacy admitted that, to her knowledge, James's demotion was not caused by, and was never connected to, James's drug use.  When specifically asked whether this work incident was due to a mistake or a result of James's drug use, Stacy answered that it was a mistake.  The evidence does not show that, by smoking marihuana, James's work productivity was affected.  The majority finds that James's marihuana use did affect his work productivity, but solely based on James's demotion, which the evidence does not show was based on James's marihuana usage.  A statement by Stacy, later contradicted on cross-examination, that James had stated to her that his demotion was based on his drug

use, is insufficient to show that James's drug use caused him to fail to attend to his business or support his family.

¶77. Stacy admitted that James's expenditures on marihuana were a minimal portion of the family income – approximately $300 annually out of a combined annual income of approximately $70,000. James's expenditures on marihuana may have been wasteful, but a $300-a-year habit for a family with an annual income of $70,000 is hardly grounds for a divorce.

¶78. James's abuse of marihuana was heavy, but there is minimal evidence that his family or work was impacted. James's admittedly wasteful spending on the marihuana was minor, and only one incident was reported indicating that James had failed to attend normally to business as a result of his drug use, and the only testimony concerning this one incident was successfully impeached by prior testimony. There was also uncontested evidence that the main cause for the decline in the family income was linked to events outside James's control, as the majority opinion concedes. After consideration of these factors, I conclude that it was an abuse of discretion for the chancellor to find that James's use of marihuana met the effect test as a like drug to opium and morphine.

## VI. Suggested Disposition and Future Proceedings

¶79. For these reasons, I respectfully dissent from the majority and would reverse and remand for further proceedings. I recognize that remanding this case after a divorce has been granted would be an unfortunate step. The obvious effect is that James and Stacy would continue to be bound together, unhappily, in matrimony. However, from the record before us, it is abundantly apparent that, on remand, the parties would have alternate grounds for

30

divorce to consider. Admittedly, this Court is not in the business of issuing advisory opinions, so I go no further as to what might or might not happen if this case were remanded.

¶80. However, in sum, I conclude that it was error for the chancery court to find that James was a habitual and excessive user of opium, morphine, or other like drug. If the Legislature wishes to provide for divorce on the grounds of abusing any illegal drug, or any dangerous drug, it of course may do so. To date, however, it has not. What the Legislature has provided is that parties may seek a divorce on the grounds of "[h]abitual and excessive use of opium, morphine or other like drug." Miss. Code Ann. § 93-5-1 (Rev. 2004). Because marihuana is unlike opium or morphine, both in physical effect and in its effect on family life, I would reverse and remand. Because the majority finds otherwise, I respectfully dissent.

**DICKINSON, P.J., AND KITCHENS, J., JOIN THIS OPINION.**